SALESIN v STATE FARM FIRE & CASUALTY COMPANY

Docket Nos. 198199, 198319. Submitted February 17, 1998, at Detroit. Decided April 21, 1998, at 9:05 A.M. Leave to appeal sought.

Brian Salesin brought an action in the Oakland Circuit Court against State Farm Fire & Casualty Company. Originally, the plaintiff sought an order to compel the defendant to submit his claim under the homeowner's policy that the defendant had issued to him to an appraisal and to appoint an umpire. However, the plaintiff was later allowed to amend his complaint to bring a class action on behalf of himself and other purchasers of property insurance from the defendant who had suffered a building loss and who the defendant had withheld from an actual cash value settlement an amount that it claimed was for contractor overhead or profit. In the amended complaint, the plaintiff sought a declaration that the defendant's withholding from an actual cash value settlement contractor overhead or profit was contrary to the language of the insurance contract and Michigan law, payment of any funds that the defendant had withheld on that basis and all other funds to which the members of the class might be entitled, and costs and reasonable attorney fees. The homeowner's policy that the defendant had issued to the plaintiff provided that the defendant would pay the cost to repair or replace the insured building, but further provided that until the actual repair or replacement of the building was completed, it would "pay the actual value of the damage to the buildings or other structures, up to the policy limits, not to exceed the replacement cost of the damaged part of the building or other structures, for equivalent construction and use on the same premises." When the plaintiff's covered building suffered water damage, the settlement amount tendered by the defendant was the amount calculated by subtracting from the agreed "total repair cost" the amount of the estimated depreciation, the policy deductible, and twenty percent of the agreed total repair cost for contractor profit and overhead. The contractor overhead and profit had been deducted in accordance with the defendant's adjustment procedures, which specified such an adjustment where the property had not been repaired or restored by a contractor. The court, Fred M. Mester, J., granted summary disposition for the plaintiff with respect to his claim that the defendant improperly deducted con-

tractor profit and overhead from its settlement offer, but refused to certify the action as a class action. The defendant appealed those portions of the judgment granting the plaintiff relief with respect to the underlying claim for payment under the policy and awarding the plaintiff attorney fees and costs, and the plaintiff appealed that portion of the judgment denying the certification of the action as a class action. The appeals were consolidated.

The Court of Appeals *held*:

1. The defendant waived any right to arbitration.

2. The policy in question does not contain a definition of "actual cash value," nor does the policy set forth the basis on which the defendant determines actual cash value. The process used by the defendant, withholding from any settlement an amount representing contractor profit and overhead until the insured structure is repaired or replaced by a contractor, is set forth in an operation procedure manual that was not part of the insurance contract. There was deposition testimony that this method of adjusting the settlement was contrary to industry norms and policies and is unique to the defendant. Neither § 2826 of the Insurance Code, MCL 500.2826; MSA 24.12826, nor the policy in question explicitly limit actual cash value payments to the cost of repair and replacement that an insured actually incurs. Accordingly, because the plaintiff paid a premium for a full replacement cost policy and because there is no reason based on logic, the language of the policy, or the record below supporting the defendant's withholding of contractor overhead and profit from the amount it tenders in settlement of its contractual obligations under the policy in question, the court properly entered a judgment that disallowed the defendant's withholding such amounts from the settlement payment.

3. Because the court denied certification of a class action without considering or making findings with respect to the factors set forth in MCR 3.501(A), there is not an adequate record on appeal to evaluate whether certification of a class action should have been granted. Accordingly, it is necessary to remand the matter to the trial court to make the required findings.

4. Because the court made no findings with respect to the appropriateness of its awards of attorney fees and costs, those awards must be vacated, and the matter must be remanded to the trial court for reconsideration of attorney fees and costs after it has reconsidered the question of certification of a class action.

Affirmed in part, vacated in part, and remanded.

1 INSURANCE — HOMEOWNER'S INSURANCE — REPLACEMENT COST — ACTUAL CASH VALUE — CONTRACTOR OVERHEAD AND PROFIT.

An insurer may not withhold from its tendered settlement under a replacement cost homeowner's insurance policy an amount representing contractor overhead and profit until and unless the insured structure is repaired or replaced by a contractor in the absence of specific language in the insurance policy defining actual cash value in a manner allowing such a deduction from any tendered settlement.

2. ACTIONS — CLASS ACTIONS — FINDINGS OF FACT — COURT RULES.

A court in determining whether to certify an action as a class action must consider and make findings with respect to the factors set forth in the court rule governing the certification of class actions (MCR 3.501[A]).

*Fabian, Sklar & Davis, P.C.* (by *Michael H. Fabian*), for the plaintiff.

*Bodman, Longley & Dahling, LLP* (by *James A. Smith* and *Rachelle Propson Tyshka*), for the defendant.

Before: CORRIGAN, C.J., and JANSEN and WHITBECK, JJ.

PER CURIAM. Defendant, State Farm Fire & Casualty Company, appeals as of right the portion of a judgment of summary disposition of September 4, 1996, granting summary disposition for plaintiff, Brian Salesin, denying summary disposition for State Farm, and awarding attorney fees to Salesin. Salesin appeals as of right the portion of the judgment denying class-action certification and the portion of the judgment that limited the award of attorney fees to $2,000 and costs to $2,000. We consolidated the appeals by an order entered December 11, 1996. We affirm the grant of summary disposition for Salesin, affirm the denial of summary disposition for State Farm, and remand to the trial court for a proper consideration of class-action certification and attorney fees and costs.

## I. BASIC FACTS

State Farm insured Salesin under a homeowner's "extra" (presumably meaning a "full replacement") insurance policy. On September 5, 1994, Salesin suffered water damage to his home from a leaking washing machine hose and made a claim. The State Farm insurance policy provides:

> We will pay the cost to repair or replace buildings under Coverage A and other structures under Dwelling Extension, subject to the following:
>
> (1) until actual repair or replacement is completed, we will pay the actual cash value of the damage to the buildings or other structures, up to the policy limits, not to exceed the replacement cost of the damaged part of the building or other structures, for equivalent construction and use on the same premises;
>
> (2) you must make claim within 180 days after the loss for any additional payment on a replacement cost basis.
>
> Any additional payment is limited to that amount you actually and necessarily spend to repair or replace the damaged buildings or other structures with equivalent construction and for equivalent use on the same premises.

The State Farm insurance policy contains a provision covering circumstances in which it and the policyholder fail to agree on the amount of the loss. Under this provision, either party can demand that the amount of the loss be set by appraisal by making a written demand for such an appraisal. Following such a demand, each party must select a competent, independent appraiser and notify the other party of this appraiser's identity; the two appraisers must then select a competent impartial umpire. If the parties are unable to agree upon an umpire, either party may ask a judge of a court of record to select the umpire. The appraisers are then to set the amount of loss. If the

appraisers agree, this amount becomes the amount of loss; if the appraisers do not agree on the amount of loss within a reasonable time, they must submit their differences to the umpire and a "[w]ritten agreement signed by any two of these three shall set the amount of the loss."

On or about November 8, 1994, State Farm sent Salesin an estimate, a Property Claim Agreement Form, and a check in the amount of $20,778.75. According to the transmittal letter, State Farm calculated this amount as follows:

> As we agreed, the total repair cost including the ceramic tile floor in the kitchen came to $27,908.98. From the above figure was subtracted $1,048.44 in betterment and $5,581.79 in profit and overhead for a total amount withheld of $6,630.23. Please note, total settlement is based on actual amount incurred.

State Farm apparently made this calculation according to its internal Operation Guide.[1] This document provides:

> c. Actual Cash Value Settlements
> 1. Calculation of Actual Cash Value
> Actual cash value (ACV) should be determined consistent with local case law or statute. When not in variance with case law, ACV is defined as replacement cost less depreciation. Operation Guide 75-50 provides specific guidelines.
> 2. ACV and General Contractor Overhead and Profit
> General contractor overhead and profit is not a component of actual cash value since the cost is not actually and necessarily incurred unless the property is repaired or restored by means of a general contractor. Under replacement cost contracts, general contractor overhead and profit

---

[1] This internal Operation Guide was obviously not part of the parties' insurance contract.

is payable if necessarily incurred at the completion of repairs. Sometimes a policyholder may require replacement cost benefits prior to completion of the job. This may become necessary because the policyholder requires the funds to make a timely payment to the repair firm. Such requests should be handled on a case by case basis. A claim representative has the latitude to issue replacement cost benefits prior to completion of repairs when the insured presents an acceptable signed contract to repair the damage or when the repairs are underway. General contractor overhead and profit may also be paid at this point if it is clear that it is being incurred.

3. Overhead and Profit when an insured does the work.

Some insureds will chose to do their own work. It will be our positions [sic] that the principle of indemnity should prevent an insured from profiting from their own losses. Insureds should be compensated for their labor at a reasonable negotiated rate and for purchase of materials. In addition, the insured should be compensated for any overhead expenses necessarily incurred.

4. Amounts spent exceeds the Property Claim Agreement allowance.

There will be cases where the amount actually and necessarily expended will exceed the amount shown on the Property Claim Agreement. The claim representative must use good judgment in determining the reason for this discrepancy. If there is an error in our estimate, or hidden damages were found, consideration should be given to further payment. The situations can be minimized if the claim representative instructs the insured to call him/her as soon as errors are noted and *before* the work is done, so any appropriate changes can be made. [Emphasis in original.]

State Farm estimated a total replacement cost of $27,908.98. From this State Farm deducted $1,048.44 for depreciation (inexplicably called "betterment" in the transmittal letter) for a net, after subtracting the $500 deductible, of $26,360.54. State Farm then further deducted, apparently according to its Operation

Guide, $5,581.79 for contractor's overhead and profit (deducting ten percent of the total replacement cost for overhead and a further ten percent for profit; twenty percent of $27,908.98 being $5,581.79) for a net payment to Salesin of $20,778.75. According to State Farm, this amount represents the "actual cash value of the damage" pursuant to § I.3(c)(1) of its policy. In fact, Salesin only expended $14,451.00 on the repairs.

## II. PROCEDURAL HISTORY

This case, in its early stages, has a peculiar procedural history. According to Salesin, he argued that he never received the full actual cash value of the damage and demanded that the dispute be submitted to appraisal proceedings, but State Farm refused to submit to appraisal. On February 3, 1995, Salesin sued, solely on his own behalf, to compel State Farm to submit to appraisal and to appoint an umpire. On June 19, 1995, Salesin filed a motion to amend the complaint and offered an amended complaint that stated this case as a class action on behalf of himself and "all purchasers of property insurance with [State Farm] who suffered a covered building loss, and [State Farm] withheld from an actual cash value settlement money it claimed was for contractor overhead and/or profit." On July 12, 1995, the trial court granted Salesin leave to file and serve the amended complaint.

In his amended complaint, Salesin sought: (a) a declaration that the "withholding of funds from an actual cash value settlement of a building claim as 'contractor profit and/or overhead' is contrary to the clear language of the contract and Michigan law"; (b)

a refund to all members of the class of all funds withheld from the actual cash value payment "and all other funds to which they may be entitled"; (c) costs and a reasonable attorney's fee with interest. On January 22, 1996, following a scheduling conference, the trial court entered a scheduling order. This scheduling order (a) set April 24, 1996, as the latest date for filing of motions for summary disposition, presumably with supporting briefs, and May 8, 1996, as the latest date for filing of reply briefs, (b) provided that a hearing with respect to these motions be held sometime between May 8 and June 3, 1996, and (c) stated, "The deadline for plaintiff's motion for class certification is extended to a date to be set by the court."

On May 21, 1996, the trial court heard oral arguments on the parties' motions for summary disposition under MCR 2.116(C)(10) (no genuine issue as to any material fact and the moving party is entitled to judgment or partial judgment as a matter of law). With respect to class action certification, Salesin's attorney made the following statement at the outset:

> *Mr. Fabian:* Okay, very briefly. As you will recall, the parties have stipulated and the Court has presented an order providing that the issue of certification was going to be reserved until such time as the Court made its determinations on the merits as to whether or not there was in fact a proper Plaintiff and then would determine, assuming that Plaintiffs recovered, whether or not it was an appropriate class for certification.[2]

After summarizing the positions of the parties and hearing oral argument, the trial court rendered its

---

[2] State Farm states that "Plaintiff's deadline for filing a class certification motion was deferred during discovery."

opinion from the bench. The trial court stated the issue as follows:

> At issue before this Court is whether the Defendant has a right, under the so called guaranteed replacement cost policy, to deduct 20 percent for contractor's profit and overhead charges, in addition to the 10 percent deduction for depreciation when it pays the actual cash value to its insured.

The trial court, apparently relying on *McMillan v Auto Club Ins Ass'n*, 450 Mich 557; 543 NW2d 920 (1995), found that in interpreting an insurance contract, a court must (a) uphold the clear meaning of the provision in the absence of an ambiguity, (b) where two constructions can be placed on a policy, adopt the one most favorable to the policyholder, and (c) examine whether the policyholder, in reading the contract language, is led to a reasonable expectation of coverage. The trial court then held:

> [T]he total amount necessary without a 20 percent deduction, must be paid to the policy holder as the total deduction is not authorized or contemplated by—in Defendant's policy of insurance.
>
> Therefore, Plaintiff's motion for summary disposition is granted. Defendant's Motion for Summary Disposition is denied. I also advise the parties that I'm denying a class action certification. Thank you.
>
> Thank you all very much for your patience today.
>
> *Mr. Smith*: Thank you, Your Honor. Appreciate th[e] Court's attention.
>
> *Mr. Fabian*: Your Honor, I know we scheduled a status conference for a week from Monday to deal with that issue of certification.
>
> *The Court*: I know.
>
> *Mr. Fabian*: I know we haven't addressed that issue yet with the Court.

*The Court*: I know, but I'm satisfied that this matter should not be addressed as a class action suit and I am denying that request.

In its judgment, incorporating these holdings, the trial court: (a) granted Salesin's motion for summary disposition, declaring that State Farm "has improperly deducted 20% of the replacement cost loss from payment of actual cash value building claims"; (b) denied State Farm's motion for summary disposition; (c) ordered that the action not be certified as a class action; (d) ordered that Salesin be granted judgment against State Farm "in the sum of $5,581.79, plus costs in the sum of $2,000, attorney's fees in the sum of $2,000, and 12% interest pursuant to MCL 600.6013(5) in the sum of $1,192.53, for a total judgment against [State Farm] in the sum of $10,774.32."

### III. THE FAILURE TO ARBITRATE

Although not raised as an issue by the parties, we note the arbitration procedure provided for in the insurance policy was not used in this case. As was indicated previously, the insurance policy included a provision that, if the parties failed to agree on the amount of a loss, then either party could invoke a procedure where each party selected an independent appraiser and an umpire would be selected. The agreement of any two of these three individuals would ultimately determine the amount of the loss. Clearly, therefore, the insurance policy provides that disputes over the amount of a loss may be submitted to arbitration. Indeed, this case began as a suit by Salesin to compel State Farm to take part in the arbitration procedure.

However, a party may waive the right to have a matter decided by arbitration:

> A party may waive its right to arbitration, and each case must be decided on the basis of its individual facts. However, waiver of a contractual right to arbitration is not favored. A party arguing there has been a waiver of this right bears a heavy burden of proof. The party must demonstrate knowledge of an existing right to compel arbitration, acts inconsistent with the right to arbitrate, and prejudice resulting from the inconsistent acts. [*Burns v Olde Discount Corp*, 212 Mich App 576, 582; 538 NW2d 686 (1995) (citations omitted).]

In general, "defending the action or proceeding with the trial," that is defending an action without seeking to invoke a right to compel arbitration, constitutes a waiver of the right to arbitration. See *North West Michigan Constr, Inc v Stroud*, 185 Mich App 649, 651-652; 462 NW2d 804 (1990), and *Hendrickson v Moghissi*, 158 Mich App 290, 299-300; 404 NW2d 728 (1987), quoting 98 ALR3d 767, § 2, pp 771-772. State Farm is the appellant with regard to the trial court's decision in favor of Salesin on the merits of this case. Given that State Farm drafted the insurance policy at issue with its arbitration provision, State Farm certainly knew of its right to arbitration. Nevertheless, State Farm apparently refused to arbitrate its dispute with Salesin and further litigated the merits of its dispute with Salesin in the trial court without seeking an order to have the dispute settled in accordance with the contractual right to arbitrate.

Thus, State Farm acted in a manner inconsistent with its right to arbitration. Further, Salesin would be prejudiced if we vacated the trial court's decision and referred the matter to arbitration at this point after

Salesin expended resources to litigate the merits of this case in the trial court, and this Court, as a result of State Farm's refusal to arbitrate. State Farm has waived any right to arbitration. Thus, we will not disturb the trial court's judgment on the merits in favor of Salesin with respect to his personal claim on the basis of the failure of the parties to arbitrate this dispute.

### IV. DEDUCTION OF CONTRACTOR'S OVERHEAD AND PROFIT

#### A. *SMITH v MICHIGAN BASIC PROPERTY ASS'N* AND THE "ACTUAL REPAIR" RULE

State Farm relies heavily on *Smith v Michigan Basic Property Ins Ass'n*, 441 Mich 181; 490 NW2d 864 (1992), for its assertion that Salesin is entitled to be paid more money only "when and if" he spends more on repairs than he has already been paid. *Smith* involved a suit by the insureds against the Michigan Basic Property Insurance Association for fire loss. *Id.* at 184. Michigan Basic's insurance policy provided for replacement cost coverage on the home in question, with a policy limit of $56,000. *Id.* at 184, n 2. The stipulated actual cash value of the home, in disrepair and in a depressed neighborhood, was $7,500. *Id.* At the time of the suit, the insureds had not completed repair or replacement of the home, as both Michigan Basic's insurance policy[3] and the statute in effect at

---

[3] Michigan Basic's insurance policy contained the following clause:

"We will pay no more than the actual cash value of the damage unless: (a) *actual repair or replacement is complete*; or (b) the cost to repair or replace the damage is both: (i) less than 5% of the amount of insurance in this policy on the building; and (ii) less than $1000." [*Smith, supra* at 185, n 3 (emphasis supplied).]

Apparently, clause b was not an issue in the case.

the time Michigan Basic issued the insurance policy and at the time of the loss[4] required.

The jury awarded a judgment of $90,607.92 in favor of the insureds. *Id.*[5] The trial court had entered an order that, in the event of a favorable verdict, the insureds were, pursuant to *Pollock v Fire Ins Exchange*, 167 Mich App 415; 423 NW2d 234 (1988), " 'entitled to recover the full replacement cost value of their home not to exceed policy limits without first having to repair or replace same.' " *Smith, supra* at 186. This Court, on that point, affirmed. *Id.* at 187. Thus, the question before the Michigan Supreme Court was whether, *before actual repair*, the insureds should receive only the stipulated actual cash value of the home of $7,500 (as Michigan Basic asserted) or whether they were entitled to an additional $48,500 (as the insureds asserted, as the jury and the trial court held, and as this Court affirmed), representing

---

[4] *As then in effect*, § 2826 of the Insurance Code, MCL 500.2826; MSA 24.12826 provided:

Riders and endorsements may, in consideration of adequate premium or premium deposit, be added to the standard fire insurance policy, insuring property, whereby the insurer agrees to reimburse and indemnify the insured for the difference between the actual value of the insured property at the time any loss or damages occurs, *and the amount actually expended to repair, rebuild or replace with new materials of like size, kind and quality,* but not to exceed the amount of liability covered by the riders or endorsements, such property as has been damaged or destroyed by fire or other perils insured against, *except that there shall be no liability by the insurer under the terms of said riders or endorsements to pay the amount specified in the riders or endorsements unless the property damaged is actually repaired, rebuilt or replaced at the same or another site.* [Emphasis supplied.]

[5] This amount included (1) the "replacement cost value" of the home, as stipulated by the parties, of $56,000, (2) $2,500 for debris removal, and (3) the actual cash value of the personal property damaged or destroyed by the fire of $26,061.16. *Smith, supra* at 184, n 2.

the difference between the $7,500 actual cash value and the replacement cost value of $56,000 (which was also the insurance policy limit).

The Michigan Supreme Court chose the first option. It modified the judgment to require, with regard to direct compensation for loss of the home, only the payment of the $7,500 actual cash value of the home and to require an additional payment of up to $48,500 (the difference between the $56,000 replacement value and the $7,500 actual cash value) "when and if the Smiths actually repair, rebuild or replace the home." *Smith, supra* at 187. In the process, the Court declined to follow *Pollock. Id.* at 189-190. The Court observed:

> The policy limits Michigan Basic's liability for replacement cost to the lesser of three amounts: (a) the policy limit, (b) the replacement cost for "like construction and use *on the same premises*" (emphasis added), or (c) the amount actually and necessarily spent to repair or replace the damaged building. [*Id.* at 191-192.]

We first note that the Legislature revised § 2826 of the Insurance Code, MCL 500.2826; MSA 24.12826, in 1990. The statute now provides that a fire insurance policy "*may* provide that there shall be no liability by the insurer to pay the amount specified in the policy *unless the property is actually repaired, rebuilt, or replaced at the same or another site.*"[6] Thus, legisla-

---

[6] Thus, *as in effect at the time of the loss and currently,* § 2826 of the Insurance Code provides:

An insurer may issue a fire insurance policy, insuring property, by which the insurer agrees to reimburse and indemnify the insured for the difference between the actual value of the insured property at the time any loss or damages occurs, and the amount actually expended to repair, rebuild, or replace with new materials

tive action has substantially eroded the statutory basis for the so-called "actual repair" rule.

Second, State Farm's insurance policy in this matter contains only *two* of the three limitations on liability contained in Michigan Basic's insurance policy in *Smith*: policy limits and replacement costs. Missing is the third limit in *Smith*: the amount actually and necessarily spent to repair or replace the damaged building. While State Farm's insurance policy here, in § I.3.c(1), refers to "actual repair or replacement," this insurance policy arguably does not make this reference in such a way as to constitute a limitation on the amount that State Farm will pay as the "actual cash value of the damage." Thus, the insurance policy basis for the so-called "actual repair" rule is arguably also absent. Therefore, while State Farm's assertion that, since *Smith*, there has been no question of the validity or enforceability of "actual repair" clauses in Michigan replacement cost policies may be true, it is also arguably immaterial to a determination whether State Farm adequately compensated Salesin for the "actual cash value of the damage."

### B. *SNELLEN* AND *GILDERMAN*

Each party in this matter relies on a case from another jurisdiction in support of its position. State Farm relies on *Snellen v State Farm Fire & Casualty Co*, 675 F Supp 1064 (WD Ky, 1987). *Snellen* involved

---

of like size, kind, and quality, but not to exceed the amount of liability covered by the fire policy. A fire policy issued pursuant to this section *may* provide that there shall be no liability by the insurer to pay the amount specified in the policy *unless the property damaged is actually repaired, rebuilt, or replaced at the same or another site.* [Emphasis added.]

a suit by an insured against State Farm for fire loss
under an insurance policy that provided replacement
cost coverage with respect to the home in question,
with a policy limit of $61,400. *Id.* at 1065-1066. The
insurance policy at issue in *Snellen* contained the fol-
lowing provisions:

"3. Loss Settlement. Covered property losses are settled
as follows: . . .

"c. Buildings under Coverage A at replacement cost at the
time of loss without deduction for depreciation, subject to
the following:

"(1) We will pay the cost of repair or replacement, with-
out deduction for depreciation, but not exceeding the
smaller of the following amounts:

"(a) the limit of liability under this policy applying to the
building;

"(b) the replacement cost of that part of the building
damaged for equivalent construction and use on the same
premises; or

"(c) the amount actually and necessarily spent to repair
or replace the damaged building.

"(2) We will pay the cash value of the damage, up to the
policy limit, until actual repair or replacement is completed.

"(3) You may disregard the replacement cost loss settle-
ment provisions and make claim under this policy for loss
or damage to buildings on an actual cash value basis and
then make claim within 180 days after loss for any addi-
tional liability on a replacement cost basis." [*Id.*]

At the time of the suit, the insured had not begun to
repair or replace her home. *Id.* at 1066. State Farm
adjusted the insured's claim by estimating the cost of
rebuilding at $50,467.45, and then deducting deprecia-
tion in various percentages totaling $9,216.27, thereby
arriving at the sum of $41,251.18. *Id.* The court stated
that the question presented was "the amount due
under the policy where the insured elects not to

repair or replace the insured property." *Id.* Referring to *Huggins v Hanover Ins Co*, 423 So 2d 147 (Ala, 1982) (holding that replacement is a condition precedent to a claim for replacement costs) and *Pierce v West American Ins Co*, 655 SW2d 34 (Ky, 1983), the court held that the insured was not entitled to claim replacement costs where she had not repaired or replaced the damaged property or even evidenced an intention to do so. *Snellen, supra* at 1067. The court then found that, under State Farm's insurance policy, the insured "is clearly limited to actual cash value of the damage, up to the policy limit." *Id.* Thus, while State Farm's contention that Kentucky follows the same "actual repair" rule as Michigan may be correct, this factor is arguably irrelevant.[7]

The court then turned to the "more difficult" question whether the insured had been paid or offered the amount due under her insurance policy. As with Michigan Basic's insurance policy in *Smith, supra,* State Farm's insurance policy in *Snellen* contained three limits that might apply in a given case: (a) the policy limit, (b) the replacement cost "of that part of the building damaged for equivalent construction and use on the same premises" and (c) "the amount actually and necessarily spent to repair or replace the damaged building." See *Snellen, supra* at 1065-1066. The court stated that the replacement cost provision is

---

[7] State Farm's contention that in *Smith,* the Michigan Supreme Court declared emphatically that costs associated with repair and replacement are not to be paid until actually incurred is somewhat misleading. In *Smith,* the Court required payment of $7,500, the actual cash value of the building, before *any* repair or replacement. This was consistent with both the statute, as then in effect, and Michigan Basic's insurance policy. If State Farm meant to imply that the *Smith* Court allowed *no* payment before repair or replacement, this implication is incorrect.

"an additional coverage which, on a theoretical basis, provides the insured with an option to replace the building, without deduction for depreciation, rather than to simply receive payment for the actual cash value of the damage sustained by the insured building" and noted that "actual cash value" was not defined in the insurance policy. *Id.* at 1068.[8] The court found that arriving at actual cash value by subtracting depreciation from full replacement costs "is certainly logical, since it values the damage with consideration for the condition of the building prior to the loss." *Id.* The court then stated:

> Thus, it was not error for the defendant to deduct depreciation from the cost of repair or replacement of specific items of the plaintiff's building in order to arrive at the actual cash value of the damage incurred in the loss. Similarly, *since the goal is to arrive at the actual cash value of the damage, non-damage factors which are applicable only in the instance of repair or replacement* such as clean up, *profit, overhead,* and permits, were properly deducted. *These factors have no relation to the value of the damage but only the expense which would be incurred if repair or replacement were involved.* [*Id.* (emphasis supplied).]

Clearly, therefore, *Snellen* supports State Farm's basic position in this case that the term "actual cash value" allows the deduction of both depreciation and con-

---

[8] We note parenthetically that the court in *Snellen* skirted the issue with which the Court in *Smith, supra,* struggled. If the insured must finance the cost of repairs, so that actual repair and replacement occurs, most lenders would be "chary" of lending the money on the basis of an unlitigated lawsuit. See *Smith, supra* at 190; see also *Zaitchick v American Motorist Ins Co,* 554 F Supp 209, 217 (SD NY, 1982) aff'd without published opinion 742 F2d 1441 (CA 2, 1983). The solution to the dilemma is the provision in both Michigan Basic's insurance policy in *Smith* and State Farm's insurance policy in *Snellen* that allows for payment of the actual cash value of the damage before repair and replacement.

tractor's overhead and profit. *Snellen* may not, however, support State Farm's position with respect to the "actual repair" rule, and, as we outline more fully below, the logic of allowing a deduction of contractor's overhead and profit on the ground that this is a "non-damage factor" that has no relation to the value of the damage is unpersuasive.[9]

Salesin relies on *Gilderman v State Farm Ins Co*, 437 Pa Super 217; 649 A2d 941 (1994). *Gilderman* involved a suit initiated as a class action by two insureds against State Farm for a covered loss under an insurance policy that provided for replacement cost coverage. *Id.* at 220.

The insurance policy at issue in *Gilderman* included the following provisions:

"(2) We will pay the cost of repair or replacement, without deduction for depreciation, but not exceeding the smallest of the following amounts:

"(a) the limit of liability this policy applying to the building; [sic]

"(b) the replacement cost of part of the building damaged for equivalent construction and use on the same premises; or

"(c) the amount actually and necessarily spent to repair or replace the damaged building.

"(3) We will pay the actual cash value of the damage, up to the policy limits, until actual repair or replacement is completed." [*Id.*]

---

[9] State Farm also cites *Truesdell v State Farm Fire & Casualty Co*, 960 F Supp 1511 (ND Okla, 1997) as supplemental authority. This case holds, and cites *Smith*, *supra*, as authority for the proposition that withholding replacement costs until repair or replacement is actually made is conscionable. See *Truesdell*, supra at 1515-1517. *Truesdell* does not, however, deal with the central issue in this case: Whether, under Michigan law and State Farm's policies, contractor's overhead and profit can be deducted from the actual cash value of the damage.

The court stated that the question presented was "whether an insurer, which has agreed to pay repair or replacement costs less depreciation in advance of actual repair or replacement of a covered loss, may automatically withhold both depreciation and a flat twenty percent representing contractor overhead and profit from its advance payment." *Id.* at 219. The court quoted the following description[10] of replacement cost coverage:

> "Replacement cost coverage was devised to remedy the shortfall in coverage which results under a property insurance policy compensating the insured for actual cash value alone. That is, while a standard policy compensating an insured for the actual cash value of damaged or destroyed property makes the insured responsible for bearing the cash difference necessary to replace old property with new property, replacement cost insurance allows recovery for the actual value of property at the time of loss, without deduction for deterioration, obsolescence, and similar depreciation of the property's value." [*Id.* at 220.]

The court then noted that, under the policy, the insured may not receive the full repair or replacement cost of a covered loss until repair or replacement occurs. *Id.* Thus, State Farm's contention that *Gilderman* does not follow the "actual repair" rule may be misplaced.[11] Again, however, this factor is arguably irrelevant.

---

[10] Apparently taken from anno: *Construction and effect of property insurance provision permitting recovery of replacement cost of property*, 1 ALR 5th 817, 827-828.

[11] State Farm is correct that a prior case in Pennsylvania, *Ferguson v Lakeland Mut Ins Co*, 408 Pa Super 332; 596 A2d 883 (1991), did hold that as a matter of public policy it was "unconscionable to require insureds to procure from their own funds, which they may not have, replacement property prior to receipt of full replacement cost since the insureds

The court in *Gilderman* then turned to the question of "actual cash value," noting that it was not defined in the insurance policy. As with Michigan Basic's insurance policy in *Smith, supra,* and State Farm's insurance policy in *Snellen, supra,* State Farm's insurance policy in *Gilderman* contained three limits: (a) the policy limits, (b) the replacement cost "of part of the building damaged for equivalent construction and use on the same premises" and (c) "the amount actually and necessarily spent to repair or replace the damaged building." *Gilderman, supra* at 220. The court found that State Farm agreed to pay its insured the "actual cash value" of a covered loss, whether or not repairs or replacement actually occur, and stated: "Repair or replacement costs logically and necessarily include *any* costs that an insured reasonably would be expected to incur in repairing or replacing the covered loss." *Id.* at 225 (emphasis supplied). Although not holding categorically that repair or replacement costs always and automatically include contractor's overhead and profit, the court observed:

> First, contractor expenses may well be contingent; however, the same can be said of all repair or replacement costs. For example, the insured may be a plumber, repair a covered loss himself, and incur no labor costs. The insured may be able to obtain goods at wholesale, used, or free and never incur the retail costs of parts. All repair or replacement costs are, in theory, "contingent" prior to being incurred.
>
> Second, and more importantly, the issue is not whether a given cost is contingent. The issue is what State Farm agreed to pay to its insureds prior to actual repair or

expected to receive such coverage by purchasing replacement value coverage." See *Gilderman, supra* at 223.

replacement. It agreed to pay "actual cash value," which means "repair or replacement cost less depreciation." Thus, the real inquiry is what is included in "repair or replacement costs." We hold that repair or replacement costs include any cost that an insured is reasonably likely to incur in repairing or replacing a covered loss. In some instances, this will include use of a general contractor and his twenty percent overhead and profit. [*Id.* at 226.]

Clearly, therefore, *Gilderman* supports Salesin's basic position in this case that the term "actual cash value" allows the deduction of depreciation but not of contractor's overhead and profit.[12] *Gilderman* does not, however, support the position that contractor's overhead and profit should always and automatically be included within the payment of actual cash value of the damage made to an insured before actual repair

---

[12] In this regard, the court commented on the "windfall" theory that State Farm advanced in *Gilderman* and, indeed, advances in this case:

In this respect, we note that insureds under these policies have paid an additional premium for replacement cost coverage that the insured can afford to repair or replace a loss at current market value and essentially keep the value of his property the same. An insured loses the benefit of the replacement cost coverage by electing not to repair or replace. It can hardly be said that an insured reaps a windfall by obtaining payment of actual cash value determined in a fair and reasonable manner when that is precisely what the insurer has agreed to pay under its policy in advance of actual repair or replacement. [*Gilderman, supra* at 227.]

Presumably, what the court meant was an insured under State Farm's insurance policy could receive the "actual cash value of the damage" (*with* a deduction for depreciation but *without* a deduction for contractor's overhead and profit) before actual repair or replacement but following actual repair and replacement could claim an additional amount (but still within the overall limits of policy limits, replacement cost, or amount actually spent) that would include depreciation. In passing, we note that this additional amount could, within the same three limits, probably include unanticipated items of cost that were not included in the original estimate.

or replacement under a replacement cost policy like the one in this case.

We find the *Gilderman* court's rationale with respect to the issue of contractor's overhead and profit to be more persuasive than that of the *Snellen* court. The original estimate of the "actual cash value of the damage" is just that, an estimate. Certainly, the insured has not incurred the cost of contractor's overhead and profit at this point. Neither, however, has the insured incurred the cost of labor or materials. It is no more logical to exclude the former, on the grounds that it is a "non-damage factor," than it is to exclude the latter. This point becomes more persuasive in light of the fact that, unlike the insurance policies in *Smith*, *Snellen*, and *Gilderman*, the State Farm insurance policy at issue in this case explicitly contains two of the same limitations (policy limits and replacement costs) that were present in those cases, but does not so explicitly contain the third limit of actual repair or replacement.

In any event, the original estimate of actual cash value of the damage under the State Farm insurance policy in force in Michigan is entirely theoretical and is therefore not limited by the lack of actual expenditures. The fact that Salesin did not, when he repaired his home, actually incur *any* costs for contractor's overhead and profit is therefore not dispositive.

### C. CONCLUSION

As in *Snellen* and *Gilderman*, State Farm's insurance policy in this case does not contain a definition of "actual cash value," nor does it set out the basis on which State Farm determines actual cash value. The process by which actual cash value would be deter-

mined was contained in State Farm's Operation Guide. In accordance with the provisions of that document, State Farm routinely deducts contractor's overhead and profit as well as depreciation when it makes an "actual cash value of the damage" payment under § I.c.(1) of its insurance policy. There was deposition testimony that this procedure is contrary to industry norms and practices. Indeed Salesin asserts, and State Farm does not appear to deny, that State Farm is the only known insurance company that deducts contractor's overhead and profit from the actual cash value payment under a homeowner's insurance policy. Further, § 2826 of the Insurance Code as currently in effect and State Farm's insurance policy itself do not explicitly limit such actual cash value payments to the costs of repair and replacement that the insured actually incurs.

It is uncomfortably true that finding that State Farm owes Salesin an additional $5,581.79 for contractor's overhead and profit will result in a payment to him for costs that he has not incurred and almost certainly will not incur. However, it is also true Salesin has paid a premium for a full replacement cost policy. There is no logical reason, nor any reason based upon the insurance policy itself or the record below, for deducting estimated contractor's overhead and profit when making payments under § I.c.(1) of State Farm's insurance policy. *Smith* does not require a contrary result and the reasoning in *Gilderman* is, we believe, superior to the reasoning in *Snellen*.

## V. CLASS-ACTION CERTIFICATION

In his amended complaint, Salesin sought to bring this case as a class action. In its January 22, 1996,

scheduling order, the trial court provided that the deadline for the filing of Salesin's motion for certification as a class action was to be "extended to a date to be set by the court." After granting summary disposition for Salesin on the merits of his individual case and denying State Farm's motion for summary disposition, the trial court stated, "I also advise the parties that I'm denying a class action certification." Salesin's counsel pointed out that a status conference had been scheduled at a future date to deal with the issue of certification and stated, "I know we haven't addressed that issue yet with the Court." The trial court responded by stating, "I know, but I'm satisfied that this matter should not be addressed as a class action suit and I am denying that request."

The trial court provided no further explanation for denying certification as a class action. Thus, the trial court simply stated its denial of certification as a class action in a conclusory manner without giving *any* meaningful explanation of this decision. Further, it appears that no date had been set for the formal filing of a motion for certification of the matter as a class action. Therefore, the trial court's denial of certification as a class action occurred before the time set by the trial court had expired for Salesin to file such a motion.

We conclude that the trial court did not properly rule with respect to the question of certification of the matter as a class action. We review a trial court's ruling regarding a certification of a suit as a class action for clear error. See *Mooahesh v Dep't of Treasury*, 195 Mich App 551, 556; 492 NW2d 246 (1992) (this Court will reverse an order of certification of a class action only if clearly erroneous).

MCR 3.501(A)(1) provides the requirements that must be met for a lawsuit to be certified as a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if:
>
> (a) the class is so numerous that joinder of all members is impracticable;
>
> (b) there are questions of law or fact common to the members of the class that predominate over questions affecting only individual members;
>
> (c) the claims or defenses of the representative parties are typical of the claims or defenses of the class;
>
> (d) the representative parties will fairly and adequately assert and protect the interests of the class; and
>
> (e) the maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice.

MCR 3.501(A)(2) sets forth various factors that a trial court "shall consider among other matters" in determining whether the maintenance of a class action would be superior to other available methods of adjudication in promoting the convenient administration of justice.

In *Adair v Detroit*, 198 Mich App 506, 511; 498 NW2d 924 (1993), this Court determined that a trial court clearly erred in certifying counterclaims as a class action without determining whether the requirements for such certification under MCR 3.501(A)(1) had been met. The *Adair* panel further stated:

> Accordingly, we cannot determine whether the trial court properly certified defendant's counterclaims as a class action. We remand for a determination whether defendant may assert its counterclaims as a class action pursuant to MCR 3.501(A). [*Adair, supra* at 511.]

Here, the trial court precluded certification of the plaintiff's suit as a class action without determining whether it should grant certification pursuant to MCR 3.501(A)(1). Further, the trial court apparently decided to deny certification as a class action without allowing Salesin's counsel to file a motion and supporting brief in support of such certification. In light of *Adair*, we therefore remand for a proper determination whether certification as a class action should be granted.

In this regard, there is no adequate factual record for this Court independently to evaluate any of the factors pertinent to a decision regarding whether certification as a class action should be granted. With regard to factor a of MCR 3.501(A)(1), it is unclear how many policyholders might be affected by State Farm's challenged policy regarding the deduction of contractor overhead and profit. The trial court also made no findings regarding factor d, i.e., whether Salesin would fairly and adequately assert and protect the interests of the class. This is a factor that would be particularly difficult for an appellate court to consider without the assistance of findings by the trial court. Similarly, the trial court did not discuss factor e, whether maintenance of a class action would be superior to other available methods of adjudication in promoting the convenient administration of justice.[13]

---

[13] Of course, if on remand the trial court properly finds that any one of the five factors enumerated in MCR 3.501(A)(1) preclude certification as a class action, it would not be necessary for the trial court to address the remaining factors. Nevertheless, as a matter of judicial economy, we encourage the trial court to address all five factors if it denies certification as a class action.

With regard to factor e, we do note that the insurance policy in this case includes a procedure for arbitration. While State Farm waived the right to arbitrate, it does not necessarily follow that State Farm would do so in all other cases. This could reasonably be considered by the trial court as tending to support a conclusion that class certification should be denied on the basis of factor e, because maintenance of a class action in the trial court would not be superior to settling disputes between State Farm and other insureds by means of arbitration. In this regard, we note that Michigan law favors arbitration. See, e.g., *Burns v Olde Discount Corp, supra* at 580 (any doubts about arbitrability of an issue should be resolved in favor of arbitration); *Jozwiak v Northern Michigan Hosps, Inc*, 207 Mich App 161, 165; 524 NW2d 250 (1994) (Michigan has a strong public policy favoring arbitration).

### VI. ATTORNEY FEES

The trial court awarded $2,000 in attorney fees to Salesin without explaining why it did so. State Farm argues that attorney fees should not have been awarded at all, while Salesin argues that the $2,000 awarded in attorney fees was unduly low. "Under the traditional 'American rule,' each side must bear its own litigation expenses, unless the law or court rules specify an exception." *Bennett v Weitz*, 220 Mich App 295, 302; 559 NW2d 354 (1996). It is unclear to us why the trial court departed from the general rule regarding attorney fees.[14] Accordingly, we vacate the award

---

[11] Salesin in his brief sets out certain bases that he asserts justified an award of attorney fees. In light of the necessity of a remand for proper

of attorney fees to Salesin. On remand, after considering the issue of certification as a class action, the trial court should reconsider whether Salesin is entitled to any attorney fees. If the trial court decides that Salesin is entitled to attorney fees, it should specifically explain its basis for such a decision and for determining the amount of any attorney fees awarded.

Similarly, the trial court awarded Salesin $2,000 in costs without specifying how it reached this determination. Salesin argues on appeal that this award was too low. We vacate the trial court's decision regarding the amount of costs awarded and remand with instructions for the trial court to reconsider the amount of costs that it should award to Salesin and to specify its basis for determining the amount of those costs.

VII. CONCLUSION

We affirm the trial court's grant of summary disposition for Salesin with respect to the substantive issue of the inclusion of contractor's overhead and profit in the payment of actual cash value of the damage to the insured property. However, we vacate the awards of $2,000 in attorney fees and $2,000 in costs to Salesin. We remand to the trial court for a proper determination of the question of certification as a class action. After properly ruling with respect to the class-action question, the trial court should consider the issues of attorney fees and costs in light of this

consideration of the issue of certification as a class action, we leave initial consideration of these possible grounds for an award of attorney fees to the trial court on remand.

remand. Salesin, being the prevailing party, may tax costs pursuant to MCR 7.219.