NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0443n.06

No. 13-2376

FILED
*Jun 17, 2014*
DEBORAH S. HUNT, Clerk

UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| WHITEHOUSE CONDOMINIUM GROUP, LLC, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| THE CINCINNATI INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| | ) | |

BEFORE:    BATCHELDER, KEITH, and STRANCH, Circuit Judges.

**STRANCH, Circuit Judge.**  This is a single-issue appeal, requiring interpretation of an insurance contract.  The question is whether, in applying the agreed-upon method of calculating fire loss coverage, the term "obsolescence" in the definition of "actual cash value" accounts for external changes in market value through the concept of "economic obsolescence."  A survey of the use of the relevant terms shows that the commonly understood meaning of the word obsolescence does not include market value decline.  To the extent that the term is ambiguous, Michigan law requires that we construe it in favor of the insured.  Accordingly, we **AFFIRM** the grant of summary judgment for the Plaintiff.

## I.    BACKGROUND

The Cincinnati Insurance Company owes Whitehouse Condominium Group money to cover losses from a fire-destroyed condominium building in Flint, Michigan. The question is how much.

According to the insurance policy purchased by Whitehouse, Cincinnati Insurance must pay the "actual cash value" of the building at the time of the loss. "Actual cash value" is defined in the contract as the "replacement cost less a deduction that reflects depreciation, age, condition and obsolescence." The policy also included an option under which Whitehouse could get the full replacement cost of the building, but it appears that Whitehouse waived this option by declining to replace the building with one for the same general purpose and using the same general construction method.

The parties disagree on the meaning of the term "obsolescence." Cincinnati Insurance would define it broadly to include the term "economic obsolescence"—meaning a decrease in market value—in which case Cincinnati Insurance claims the actual cash value would be only $1,187,660.38. Whitehouse would interpret the term more narrowly to include only "functional obsolescence," in which case Whitehouse claims the actual cash value was $2,767,730.00. In other words, the dispute is over whether Cincinnati Insurance gets the benefit of a decrease in market values in Flint, Michigan.

Whitehouse sued Cincinnati Insurance, requesting a declaratory judgment on the proper construction of the term obsolescence. Both parties moved for summary judgment. The district court held as a matter of law that the term was unambiguous and that it did not include economic obsolescence. The court began its analysis by determining that the competing dictionary definitions offered by the parties did not resolve the question and that Michigan courts had never

squarely settled the issue. Taking cues from a Southern District of New York case involving very similar policy language, the district court concluded that nothing in the contract indicated that the parties intended to incorporate market value into the calculation of actual cash value. The contract did not state that the calculation required consideration of all pertinent evidence, as in the court-created broad evidence rule; the phrase "deduction" suggested that market value was not included because markets can also increase; and the parties would have used the phrase "market value" if they intended it to be considered. As for unrelated caselaw in the tax assessment and eminent domain contexts, the district court held that these cases were irrelevant to the meaning of this policy.

The district court granted summary judgment to Whitehouse, and Cincinnati Insurance now appeals.

## II.     ANALYSIS

### A. Standard of Review and Applicable Law

As Cincinnati Insurance has appealed a grant of summary judgment on a legal issue, appellate review is de novo. *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012). Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant, here Whitehouse, is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). This case involves no factual disputes.

When interpreting a contract in a diversity case, the court applies the law, including the choice of law rules, of the forum state—in this case, Michigan. *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008). The insurance policy here has no choice-of-law provision, so we must consider the following five factors, as instructed by the Michigan Supreme Court: place of contracting, place of negotiation, place of performance, location of the subject-matter of the

contract, and place of incorporation of the parties. *Id*. (citing *Chrysler Corp. v. Skyline Indus. Servs.*, 528 N.W.2d 698, 702 (Mich. 1995); Restatement (Second) of Conflict of Laws § 188(2) (1971)). Here, all five elements point toward Michigan law, and the parties agree that Michigan law applies. In resolving questions of state law, this court looks first to final decisions of that state; if no decision directly on-point exists, then we must make an *Erie* guess as to how that court would resolve the issue. *Conlin v. Mortg. Elec. Registration Sys.*, 714 F.3d 355, 358-59 (6th Cir. 2013). In making this determination, intermediate state court decisions can be persuasive. *Id*. at 359.

In Michigan, an insurance contract is generally to be interpreted like any other contract, according to Michigan contract interpretation principles. *Stryker Corp. v. XL Ins. Am.*, 735 F.3d 349, 354 (6th Cir. 2012); *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005). The meaning of a contract is a question of law, as is the question of whether contract language is ambiguous. *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003). The relevant contract interpretation principles are simple enough—courts should enforce contract language in accordance with its plain and commonly used meaning, being careful to enforce specific and well-recognized terms. *Henderson v. State Farm*, 596 N.W.2d 190, 193-94 (Mich. 1999); *Stryker*, 735 F.3d at 354. A contract should be read as a whole instrument and with the goal of enforcing the intent of the parties. *Prestige Cas. Co. v. Mich. Mut. Ins. Co.*, 99 F.3d 1340, 1350 (6th Cir. 1996); *see also Wilkie*, 664 N.W.2d 781-82 (holding that a term ambiguous on its own became unambiguous in context).

If an insurance contract provision is ambiguous—meaning it is susceptible to two different reasonable interpretations—it is strictly construed against the insurer. *Henderson*, 586 N.W.2d at 194; *Stryker*, 735 F.3d at 354. The parties incorrectly suggest that the district

court should consider extrinsic evidence to construe ambiguous terms. This might be correct in the non-insurance context in which Michigan courts use extrinsic evidence to determine the "meaning of an ambiguous contract" as a question of fact. *See Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 469-70 (Mich. 2003). It might also be true where an insurance question involves a question of fact as to the "application of the term or phrase" to the underlying events. *Henderson*, 596 N.W.2d at 193. But where, as here, the issue only requires the court to construe an ambiguous insurance policy term, the Michigan Supreme Court has stated unexceptionally that "ambiguous policy provisions in an insurance contract ha[ve] to be construed against the insurance company and in favor of the insured." *Wilkie*, 664 N.W.2d at 784. Interpretation techniques that look outside the insurance policy, such as the rule of reasonable expectations in which courts rewrite contracts in light of the parties' intent, "is just a surrogate for the rule of construing against the drafter." *Wilkie*, 664 N.W.2d at 782, 786-87. "[S]tating that ambiguous language should be interpreted in favor of the policyholder's reasonable expectations adds nothing to the way in which Michigan courts construe contracts" because "it is already well established that ambiguous language should be construed against the drafter, i.e., the insurer." *Id*. at 787; *see also Raska v. Farm Bureau Mut. Ins. Co.*, 314 N.W.2d 440, 441 (Mich. 1982); *see also Stryker*, 735 F.3d at 354.

The mere fact that a term is undefined in an insurance contract does not render the term ambiguous. *Henderson*, 596 N.W.2d at 194. Undefined terms, too, should be construed according to their commonly used meaning unless it is apparent from the whole policy that a special meaning was intended. *Id*. at 193-94; *see also Prestige*, 99 F.3d at 1350. And the words should not be parsed in isolation because they may convey a different meaning in context when used in conjunction with other words. *Henderson*, 596 N.W.2d at 194-95.

**B. Obsolescence**

The entire dispute in this case involves the precise meaning of the term "obsolescence," a term undefined in the insurance policy. The term appears within the contract definition of "actual cash value," which is "replacement cost less a deduction that reflects depreciation, age, condition, and obsolescence." More specifically, the question is whether the term obsolescence includes a reduction in market value due to factors external to the property itself.

Cincinnati Insurance would include in the term obsolescence two different components: functional obsolescence and economic obsolescence. Generally, functional obsolescence means a loss in value due to something inherent to the building itself such as old technology (think an electrical panel that is no longer acceptable under current codes) or bad design (think a five bedroom house that has only one bathroom). *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props.*, 445 F. Supp. 2d 320, 348 (S.D.N.Y. 2006) [hereinafter *WTC*]; Black's Law Dictionary (9th ed. 2009). Economic obsolescence means a reduction in value due to market factors entirely external to the building, such as neighborhood factors (this might occur if the neighborhood were suddenly under a noisy flight path) or the general market (the real estate market crash appears to be the factor in this case). *See Dickler v. CIGNA Prop. & Cas. Co.*, 957 F.2d 1088, 1100 (3d Cir. 1992); Black's Law Dictionary (9th ed. 2009). Whitehouse calls Cincinnati Insurance's position "definitional high jinks" and argues that it is inconsistent with the common use of the term obsolescence and is offered merely to remedy the insurer's failure to include market value in the actual cash value definition. According to Whitehouse, economic obsolescence is a specialized concept used only in certain settings and does not fall within the generic meaning of obsolescence.

We must first attempt to discern the commonly used meaning of these terms. Dictionaries support the position that economic obsolescence is a specialized concept not included in the commonly used definition of obsolescence. *See e.g.*, *McNeel v. Farm Bureau Gen. Ins. Co.*, 795 N.W.2d 205, 214 (Mich. 2010) (consulting a lay dictionary to attempt to discern common meaning of undefined contract term); *Twichel v. MIC Gen. Ins. Corp.*, 676 N.W.2d 616, 622 (Mich. 2004) (citing to three different lay dictionaries to discern the primary features of "ownership"). One dictionary defines obsolescence as "the condition of no longer being used or useful: the condition of being obsolete" with "obsolete," in turn, defined as "a: no longer in use or no longer useful [as in] an obsolete word; b: of a kind or style no longer current: old-fashioned [as in] an obsolete technology." *Merriam-Webster.com* (last visited May 21, 2014). Another defines it as "becoming obsolete," with obsolete defined as "no longer produced or used; out of date: [as in] 'the disposal of old and obsolete machinery,' [and] 'the phrase was obsolete after 1625.'" *OxfordDictionaries.com* (last visited May 21, 2014). Webster's, the source cited below by Whitehouse, defines obsolescence as "1. Becoming obsolete; passing out of use as a word. 2. Intending to become out of date, as machinery, etc." Random House Webster's College Dictionary (1997). All of these definitions point to a common understanding that something becomes obsolete when it becomes outdated due to some feature inherent to the thing itself.

Turning to Black's Law Dictionary, as advocated by Cincinnati Insurance, complicates matters slightly because it includes both the generic definition and more specific variations of the term:

> **obsolescence** . . . 1. The process or state of falling into disuse or becoming obsolete. 2. A diminution in the value or usefulness of property, esp. as a result of technological advances. • For tax purposes, obsolescence is usu. distinguished from physical deterioration. . . .

> **economic obsolescence.** Obsolescence that results from external economic factors, such as decreased demand or changed governmental regulations. — Also termed external obsolescence. Cf. functional obsolescence. . . .
>
> **functional obsolescence**. Obsolescence that results either from inherent deficiencies in the property, such as inadequate equipment or design, or from technological improvements available after the use began. Cf. economic obsolescence.

Black's Law Dictionary (9th ed. 2009). This definition gives some legitimacy to Cincinnati Insurance's position that economic obsolescence is a recognized subset of the generic term, but the generic definition supports Whitehouse's position because it indicates that technological changes are the most commonly understood cause of obsolescence. As the district court pointed out, this definition does not clarify whether economic obsolescence is commonly understood as part of the generic term or whether it is a specialized term used in specialized contexts.

A survey of caselaw suggests that the term economic obsolescence is more of a specialized term. In Michigan Supreme Court opinions, the term economic obsolescence appears only in the tax assessment context where it is used to determine the "true cash value" or "fair market value" of a property for taxing purposes. *See*, *e.g.*, *Meadowlanes Ltd. Dividend Housing Ass'n v. City of Holland*, 473 N.W.2d 636, 643, 651 (Mich. 1991); *see also Antisdale v. City of Galesburg*, 362 N.W.2d 632, 637 n.1 (Mich. 1984); *C.A.F. Inv. Co. v. Twp. of Saginaw*, 302 N.W.2d 164, 180-81 (Mich. 1981) (Levin, J., concurring). This is generally consistent with other states, *see*, *e.g.*, *WTC*, 445 F. Supp.2d at 348 (consulting New York tax cases to discern meaning of the term), and with the federal courts of appeals, *e.g.*, *Helmsley v. City of Detroit*, 380 F.2d 169, 173 (6th Cir. 1967) (considering economic obsolescence in valuation by tax assessor). In the only federal court of appeals case using the term economic obsolescence in the context of building insurance, the Third Circuit held that neither economic obsolescence nor functional obsolescence were components of depreciation within a building insurance contract that defined actual cash value as "replacement cost less depreciation." *Dickler*, 957 F.2d at 1100.

Cincinnati Insurance asks the court to simply adopt an "inclusive definition" that includes all possible forms of obsolescence. This is contrary to Michigan law, which instructs employment of the commonly used meaning of the term, not a special meaning. *See Henderson*, 596 N.W.2d at 193-94 (noting that terms should be given their commonly used meaning even though "dictionary publishers are obliged to define words differently to avoid plagiarism"). Indeed, it is not necessary to adopt any particular definition; we merely have to discern whether the common meaning includes market value decline. *See*, *e.g.*, *Citizens Ins. Co. v. Pro-Seal Serv. Grp.*, 730 N.W.2d 682, 687 (Mich. 2007); *Greenville Lafayette, LLC v. Elgin State Bank*, 818 N.W.2d 460, 465 n.4 (Mich. Ct. App. 2012). On balance, it appears that the commonly understood use of the term obsolescence does not include a decline in market values. At most these sources might suggest that the term is ambiguous.

Next, as Michigan law instructs, we look to the whole contract and interpret the term in context. *Prestige*, 99 F.3d at 1350. The term obsolescence appears within the contract definition of "actual cash value," which is one of several methods insurers use to value a property in the event of a loss. Other methods are market value, reproduction value, and replacement value. *See*, *e.g.*, *Haley v. Farm Bur. Ins. Co.*, No. 302158, 2013 WL 4525924, at *10 (Mich. Ct. App. Aug. 27, 2013) (explaining market value, reproduction value, and replacement value as compared to actual cash value); *Salesin v. State Farm*, 581 N.W.2d 781, 790 (1998) (explaining that replacement cost is additional coverage allowing the insured to replace a building without deduction for depreciation and obsolescence). Many courts, including those in Michigan, have adopted what is known as the "broad evidence" rule to determine the actual cash value when the

term is undefined in a contract.[1]  *See Davis v. Nat'l Am. Ins. Co.*, 259 N.W.2d 433, 438 (Mich. 1977).  Under the rule, factfinders or appraisers may consider "any evidence logically tending to the formation of a correct estimate" of the value of the property, including "market or reproduction or replacement values."  *Id*.; *Evanston Ins. Co. v. Cogswell Props. LLC*, 683 F.3d 684, 688 (6th Cir. 2012).  Specific forms of evidence that may be relevant under the broad evidence rule include:

> "the cost of restoration or replacement of the building less depreciation; the age of the property; the economic value of the property; the condition in which the property is maintained; the income derived from the building's use; the property's location; *the degree of obsolescence, both structural and functional*; the profit likely to accrue on the property; the material of which the building is composed; *the market value*; the opinions regarding value given by qualified witnesses; the potential gainful uses to which the building might have been or may be put; the building's value for purposes of rental; and any other facts disclosed by the evidence which may possibly throw light on the actual value of the building at the time of loss, including the property's salvage value, if any."

*Dickler*, 957 F.2d at 1097 (quoting *Insuring Real Property* § 24.04(2) at 24–30 (Stephen A. Cozen, ed., 1989)) (emphasis added).

While the broad evidence rule is not used when a policy defines actual cash value, like the policy at issue here, its existence helps elucidate the fact that terms like obsolescence, market value, and depreciation are all generally seen as *different* potentially relevant factors.  Where a contract incorporates some of the factors and not others, it is reasonable to think that the others were left out intentionally.  *E.g.*, *Dickler*, 957 F.2d at 1100 ("[A]lthough 'economic

---

[1] Some lower Michigan courts have suggested that actual cash value means only replacement cost less depreciation.  *Haley*, 2013 WL 4525924, at *9 (affirming finding of actual cash value based on expert's opinion that it meant "'the replacement cost less physical and economic depreciation based on age and condition'"); *GHD Operating, L.L.C. v. Emerson Prew, Inc.*, No. 278857, 2009 WL 249399, at *5-6 (Mich. Ct. App. Feb. 3, 2009) (discussing experts who both agreed that actual cash value is generally replacement cost less depreciation); *Salesin*, 581 N.W.2d at 790 (Insured "agreed to pay the 'actual cash value,' which means 'repair or replacement cost less depreciation.'").

obsolescence' may play a part in determining actual cash value under the 'broad evidence' rule, it should not be considered by a fact finder where, as here, the parties have precluded application of the 'broad evidence' rule by defining actual cash value as replacement cost less depreciation."). In fact, it appears that Cincinnati Insurance used a similar argument in a case where it fought the *insured's* attempt to give actual cash value, as defined identically to the one here, a meaning that included market value, potentially raising estoppel concerns. *See Cincinnati Ins. Co. v. Bluewood, Inc.*, No. 06-04127-CV-C-NKL, 2007 WL 4365738, at *3 (W.D. Mo. Dec. 12, 2007), *aff'd*, 560 F.3d 798 (8th Cir. 2009). More importantly for this court's purposes, an insured would be unlikely to think she was paying for insurance that accounted for a reduction in market value where the insurance contract did not specifically list it.

Another component of the relevant context is the full contract definition of actual cash value: "replacement cost less a deduction that reflects depreciation, age, condition, and obsolescence." All three of the other terms listed—depreciation, age, and condition—reflect something inherent to the building itself rather than an external market condition, suggesting that obsolescence is similarly restricted. *See Bloomfield Estates Improvement Ass'n, Inc. v. City of Birmingham*, 737 N.W.2d 670, 675 (Mich. 2007) (using doctrine of noscitur a sociis, meaning "a word or phrase is given meaning by its context or setting," to interpret contract language).

Additionally, as the district court explained below, the contract definition only allows for *reductions* for various purposes, not for additions, possibly suggesting that market values, which can also increase, were not intended to be included. While Cincinnati Insurance rightly observes that the term "obsolescence" necessarily means a reduction, this does not undermine the main point. In light of the contract language, the insured would not likely believe, based solely on the term obsolescence, that she was purchasing insurance that included a deduction for declines in

market value.  *See Wilkie*, 664 N.W.2d at 787 (noting that the policyholder cannot be said to have had an expectation not clear from the contract).  This reasoning is consistent with the analysis of the New York district court in the World Trade Center case.  *See WTC*, 445 F. Supp. 2d at 349-50.[2]

We conclude that the term obsolescence, as commonly understood, does not account for a decline in market value.  To the extent that the term obsolescence is ambiguous as to whether it includes economic obsolescence, we strictly construe it against Cincinnati Insurance.  *See Henderson*, 596 N.W.2d at 194; *Stryker*, 735 F.3d at 354.  This result preserves the benefit of the bargain of both parties.  As other courts have noted, "[i]t can hardly be said that an insured reaps a windfall by obtaining payment of actual cash value determined in a fair and reasonable manner when that is precisely what the insurer has agreed to pay under its policy in advance." *Gilderman v. State Farm*, 649 A.2d 941, 946 (Penn. 1994).

### III.    CONCLUSION

For the reasons explained above, we **AFFIRM** the grant of summary judgment to the Plaintiff.

---

[2]Cincinnati Insurance argues that it was improper for the district court to consider *WTC* because its underlying insurance contract is distinguishable from the contract at issue here and because *WTC* is extrinsic evidence that the court could not consider when construing an unambiguous contract term.  The district court committed no error by considering persuasive authority from another court that also had to discern the commonly understood meaning of the term obsolescence.  Moreover, caselaw does not amount to extrinsic evidence.  *See* Black's Law Dictionary (9th ed. 2009).