800 F.2d 617
 CAPITOL REPRODUCTION, INC., a Michigan corporation, and
Capitol Air Surveys, Inc., a Division of Capitol
Reproductions, Inc., Plaintiffs-Appellees,
v.
HARTFORD INSURANCE COMPANY, Defendant-Appellant.
 No. 84-1040.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 23, 1985.
Decided Sept. 10, 1986.
 
 Maureen Holahan, argued, Holahan, Malloy, Maybaugh, Monnich, Troy, Mich., for defendant-appellant.
 Ralph Sosin, argued, Birmingham, Mich., for plaintiffs-appellees.
 Before ENGEL and MILBURN, Circuit Judges, and WISEMAN,* District Judge.
 ENGEL, Circuit Judge.
 
 
 1
 Hartford Insurance Company appeals from a judgment entered against it and in favor of plaintiff Capitol Reproductions, Inc., holding it obligated to indemnify Capitol for the sum of $62,500 in settlement costs and $1,065.60 attorney fees incurred in settling a third party action against Capitol. The district court held that an umbrella insurance policy which Capitol had taken out with Hartford covered the loss in question, that Hartford had wrongfully failed to defend the third-party action brought against Capitol, and that, in addition, because of the failure to defend, Hartford was not entitled to a $25,000.00 retained liability benefit under the umbrella policy. We affirm.
 
 
 2
 The legal questions under Michigan law regarding the insurance policies in this diversity case are most easily understood if the facts underlying the actual loss are first briefly described.
 
 I.
 
 3
 In March, 1972, Linard Building Company, a Michigan corporation engaged in residential construction, purchased 46.78 acres of vacant land in the City of Troy, Oakland County, Michigan, intending to develop the premises into two platted residential subdivisions. To that end, it engaged the services of Giffels-Webster Engineers, Inc., and entered into a contract whereby the latter would serve as Linard's professional engineering representative in connection with the development of the land, and would provide engineering and surveying services related to the plats, storm drainage, sanitary sewage, draining, paving, retention areas, and other like developmental services. In connection with these services, Giffels-Webster obtained from plaintiff here, Capitol Reproductions, Inc., an aerial topographical survey of the property in question. In reliance upon the accuracy of the survey, Giffels-Webster commenced development of the property. It was ultimately discovered that the survey was incorrect, and that in consequence Giffels-Webster had placed sewer lines in the subdivisions three to four feet above their appropriate depth. Accordingly, Linard brought an action in the Oakland County Circuit Court alleging improper performance of its contract by Giffels-Webster, and seeking as part of the damages the cost of digging, trucking and spreading 130,000 yards of fill dirt which had been needed to raise the level of the subdivision by an average of three feet to assure that the sewer lines were at the appropriate level. Linard also claimed that it would incur additional costs in constructing the subdivision on the uncompacted fill dirt which had to be trucked in. It also claimed losses to the value of the subdivision lots themselves due to death of trees which were destroyed by the additional fill, and also a loss of aesthetic value due to the increased visibility of a main thoroughfare which was located near the subdivision.
 
 
 4
 In March, 1976, Giffels-Webster added Capitol Reproductions as a third-party defendant and sought indemnification from it on the basis that its defective survey had caused the loss for which Giffels-Webster was liable to Linard.
 
 
 5
 Capitol Reproductions at the time was covered by two separate policies of liability insurance with Hartford Insurance Company. A comprehensive general liability insurance policy with Hartford provided general coverage against liability for personal injury and property damages with limits of liability for property damage of $50,000 for each occurrence and with a $50,000 aggregate. While the comprehensive policy generally insured against property damage caused by any occurrences during the term of the policy and called upon Hartford to defend any suits, even if they were groundless, exclusion (k) of the policy provided:
 
 This insurance does not apply:
 
 6
 to bodily injury or property damage resulting from the failure of the named insured's products or work completed by or for the named insured to perform the function or serve the purpose intended by the named insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any insured; but this exclusion does not apply to bodily injury or property damage resulting from the active malfunctioning of such products or work;
 
 
 7
 Hartford also provided Capitol with an umbrella liability policy for accidental property damage which carried an occurrence limit of $1,000,000, but with a retained limit of $25,000.[1] This policy contained no equivalent to exclusion (k) of the comprehensive general liability policy. This policy did require Hartford to defend Capitol against any suit that alleged liability within the terms of the umbrella policy which was not covered by one of the underlying policies. Included among the schedule of underlying insurance policies for which the umbrella policy provided excess coverage, was the comprehensive general liability policy earlier referred to.
 
 
 8
 Upon being added as a third-party defendant in the Oakland County suit, Capitol called upon the Hartford to defend it, or otherwise to honor its obligation under the comprehensive and umbrella policies then in effect. After an investigation, Hartford concluded that the claim did not come within the coverage of either policy and declined either to defend Capitol or to participate in any negotiations for the settlement of Capitol's potential liability. Capitol thereupon proceeded to settle its liability by the payment of the sum of $62,500 and in the course thereof incurred legal expenses of $1,065.60. It then brought this action against Hartford which was removed on the basis of diversity to the United States District Court for the Eastern District of Michigan.
 
 
 9
 After the parties stipulated to the facts, United States District Judge Anna Diggs Taylor held that exclusion (k) of the comprehensive policy effectively relieved Hartford of any obligation under that policy. Capitol does not appeal that holding. She entered a summary judgment in favor of Capitol Reproductions and against Hartford, though, on the umbrella policy in the sums sought. She further found that because Hartford had refused to honor its obligation to defend Capitol, it was not entitled to the $25,000 retained liability which had been reserved in the umbrella policy. Hartford appeals.
 
 II.
 
 10
 Under Michigan law an insurer's duty to defend its insured depends upon the allegations in the underlying complaint and is not limited to meritorious suits.
 
 
 11
 "The duty of the insurer to defend the insured depends upon the allegations in the complaint of the third party in his or her action against the insured. This duty is not limited to meritorious suits and may even extend to actions which are groundless, false, or fraudulent, so long as the allegations against the insured even arguably come within the policy coverage. An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy. Dochod v Central Mutual Ins Co, 81 Mich App 63, 264 NW2d 122 (1978). The duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible. Shepard Marine Construction Co v Maryland Casualty, Co 73 Mich App 62, 250 NW2d 541 (1976). In a case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor. 14 Couch on Insurance 2d, Sec. 51:45, p 538."
 
 
 12
 Western Cas. & Sur. Group v. Coloma Twp., 140 Mich.App. 516, 364 N.W.2d 367, 369 (1985), quoting Detroit Edison Co. v. Michigan Mut. Ins. Co., 102 Mich.App. 136, 141-42, 301 N.W.2d 832 (1980) (emphasis in original). The specific terms of the umbrella policy defense endorsement echo this obligation:
 
 VI Defense, Settlement:
 
 13
 With respect to any occurrence not covered by the underlying policies listed in item 7 of the Declarations or any other underlying insurance collectible by the insured, but covered by the terms and conditions of this policy except for the amount of retained limit specified in item 4 of the Declarations, the company shall:
 
 
 14
 (a) defend any suit against the insured alleging such an occurrence and seeking damages on account thereof, even if such suit is groundless, false or fraudulent;
 
 
 15
 Hartford was therefore obligated to defend any action that alleged liability within the terms of the umbrella policy.
 
 III.
 
 16
 The premise of Linard's and Giffels-Webster's claims, and consequently of Capitol's claim against Hartford, was that the land on which Linard proposed to build a subdivision was damaged by the improper installation of sewage lines. Hartford contends that these claims did not fall within the umbrella policy's coverage because there was neither property damage nor an accident within the meaning of the policy and consequently no occurrence within the meaning of the policy.
 
 
 17
 Hartford first contends that the claims on which Capitol seeks indemnification do not state a claim for "injury to or destruction of tangible property" and consequently do not allege property damage. Hartford, instead, characterizes the claim as one for the loss of use of the property.
 
 
 18
 Generally, to constitute property damage, the damage need not itself be physical or tangible, although in this case it seems that the misplacement of the pipes could well be characterized as physical or tangible damage to the land. In Bundy Tubing Co. v. Royal Indem. Co., 298 F.2d 151 (6th Cir.1962), a fact pattern very similar to the present one, defective steel tubes, manufactured by Bundy, were installed in concrete floors of buildings as part of hot water heating systems. The court found:
 
 
 19
 In our opinion, property was damaged by the installation of defective tubing in a radiant heating system which caused the system to fail and become useless. A homeowner would never have such equipment installed if he knew that it would last only a very short time. A home with a heating system which did not function would certainly not be suitable for living quarters in the wintertime. The market for its sale would be seriously affected.
 
 
 20
 298 F.2d at 153.
 
 
 21
 In Bundy this court thus applied a market value definition for property damage that was subsequently adopted by the Michigan Court of Appeals in Economy Mills of Elwell v. Motorists Mut. Ins. Co., 8 Mich.App. 451, 154 N.W.2d 659 (1967). In Economy Mills, a grain elevator sought a declaratory judgment that its insurer was obligated to defend it against suits by farmers to whom the elevator had sold seed that would not mature during Michigan's growing season. After quoting Bundy, the court stated,
 
 
 22
 It appears to this Court that Bundy, supra, supports plaintiff instead of defendant in the instant case. Defendant, Motorists Mutual Insurance Company, herein asserts that the land of the claimants was not injured or destroyed just as Royal asserted in Bundy, supra, that the old concrete was not injured or destroyed. The court in Bundy, supra, decided that the accident caused a loss in market value of the home and this was sufficient. In our case, it may be said that the market value of the fields in which the defective seeds were planted for the season in question was seriously affected by the accident and therefore constituted injury to property.
 
 
 23
 154 N.W.2d at 662-63.
 
 
 24
 Other states have also adopted a market value test for property damage. See Elco Ind. Inc. v. Liberty Mut. Ins. Co., 90 Ill.App.3d 1106, 46 Ill.Dec. 319, 414 N.E.2d 41 (1980); Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 461 N.E.2d 209 (1984); Sturges Mfg. Co. v. Utica Mut. Ins. Co., 37 N.Y.2d 69, 371 N.Y.S.2d 444, 332 N.E.2d 319 (1975); Sola Basic Ind. Inc. v. United States F. & G. Co., 90 Wisc.2d 641, 280 N.W.2d 211 (1979); St. Paul Fire & Marine Ins. Co. v. Sears Roebuck & Co., 603 F.2d 780 (9th Cir.1979). The Third Circuit has concluded that this is the majority view among the states. McDowell-Wellman Eng. v. Hartford Acc. & Indem., 711 F.2d 521, 525-26 n. 7 (3d Cir.1983).
 
 
 25
 Following the view adopted by Michigan and a majority of the states, in the present case it is irrelevant whether the injury which caused a diminution of the land's value is characterized as a tangible injury to the land or as an intangible injury to its intended use. The sole matter of concern under this view is whether the property suffered a loss in value because of the improper placement of sewage lines.[2] Linard and Giffels-Webster alleged that expensive restorative measures were necessary to compensate for the shallow pipes and that the land would never be completely restored to its former utility. Linard did not claim damages for its loss of productive value of the land during the period of repairs, but rather for the expense of restoring the land and for the permanent loss of the land's productive value, to the extent that it could not be restored to its former usefulness. These allegations were sufficient under Michigan law to raise a claim of injury to tangible property, and hence, of property damage.[3]
 
 
 26
 Hartford also contends that there was no "accident" within the meaning of the policy and therefore no "occurrence" which would give rise to a duty to defend Capitol. The policy does not define the word "accident" but Hartford argues that an accident must be a sudden or instant happening and that there was no sudden or instant happening alleged.
 
 
 27
 The Michigan Supreme Court has defined accident without reference to suddenness in a case where the insured trailer manufacturer had been found liable for illness caused by defects in the trailer.
 
 
 28
 "An 'accident,' within the meaning of policies of accident insurance, may be anything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and unexpected by the person injured or affected thereby--that is, takes place without the insured's foresight or expectation and without design or intentional causation on his part. In other words, an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected."
 
 
 29
 Guerdon Ind., Inc. v. Fidelity & Cas. Co., 371 Mich. 12, 123 N.W.2d 143, 147 (1963) (quoting Couch on Insurance, 2d ed. Sec. 41:6, p. 27). The court concluded that allegations that the insured had improperly installed plumbing which caused illness sufficed to raise a duty to defend on the part of the insurer. See also Economy Mills of Elwell, Inc. v. Motorists Mut. Ins. Co., 8 Mich.App. 451, 154 N.W.2d 659 (1967). Applying this definition, we conclude that the complaint alleged an accident sufficient to raise a claim of liability within the coverage clause of the umbrella insurance policy.
 
 
 30
 Hartford contends, though, that liability was excluded from coverage by the umbrella policy under exclusions (d) and (e) of the agreement. Exclusions (d) and (e) provide:
 
 
 31
 This policy does not apply: ...
 
 
 32
 (d) to Property Damage to
 
 
 33
 (1) goods or products (including any container thereof) manufactured, sold, handled or distributed by the named insured, or by others trading under his name, or premises alienated by the named insured, arising out of such goods, products or premises or any part of such goods, products or premises; or
 
 
 34
 (2) work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;
 
 
 35
 (e) to such part of any damages or expenses which represents the cost of inspecting, repairing, replacing, removing, recovering, withdrawing from use or loss of use of, because of any known or suspected defect or deficiency therein, any
 
 
 36
 (1) goods or products or any part thereof (including any container) manufactured, sold, handled or distributed by the named insured, or by others trading under his name; or
 
 
 37
 (2) work completed by or for the named insured; or other property of which such goods, products or work completed are a component part or ingredient;"
 
 
 38
 Hartford argues that exclusions (d) and (e) "negate coverage in suits against a contractor for breach of contract and faulty workmanship on projects where the damages claimed were the cost of correcting the work itself." The truth of this assertion is not questioned. Capitol, though, does not seek indemnification for the cost of correcting the aerial survey, but rather, it seeks indemnification for the damages caused to other property by errors in its aerial survey. It was this risk to property other than the insured's own work that gave rise to the liability for which Capitol seeks indemnification. Exclusions (d) and (e) do not negate coverage in this suit.
 
 
 39
 We thus conclude that liability for damages to other property from the use of Capitol's aerial survey was not excluded from coverage, and we find it significant that liability for damages or injuries suffered through reliance on an inaccurate map or survey is not uncommon. See Reminga v. United States, 631 F.2d 449 (6th Cir.1980); De Bardeleben Marine Corp. v. United States, 451 F.2d 140 (5th Cir.1971). Moreover, Hartford could exclude, and in other policies had excluded, such coverage. See Engel v. Credit Life Ins. Co., 145 Mich.App. 55, 377 N.W.2d 342, 346 (1985). The comprehensive general liability policy issued by Hartford to Capitol included an insuring clause similar to the coverage of the umbrella policy. As we noted before, though, that policy explicitly excluded coverage for "property damage resulting from the failure of the named insured's products ... to perform the function or serve the purpose intended by the named insured, if such failure is due to a mistake or deficiency in any design, formula, plan [or] specifications ... prepared or developed by any insured...." Had Hartford desired, it certainly could have included such a provision in the umbrella policy. Since it did not, we are left with the conclusion that the umbrella policy was intended not only to insure against risks beyond the dollar-value of the comprehensive general liability policy, but also to insure against risks beyond the coverage of that policy.
 
 
 40
 The declarations in the umbrella policy in this regard are typical of most types of business insurance arrangements whereby the insured obtains and keeps in force a number of policies of primary insurance covering risks against which it needs the protection of insurance. These underlying policies generally may be limited in the type of loss covered, and in normal claims the underlying policies are adequate to take care of both the losses described therein and the cost of defending those losses. The umbrella insurance policy on the other hand performs a further service of providing a broader range and a greater dollar-value of coverage in excess of the coverage afforded by the primary insurer. In this way, the costs of the excess insurance can be minimized, and the premium is determined based upon the amount of the limits, but also as influenced by the knowledge that most losses can be adjusted satisfactorily within the limits of the primary insurance policies which the insured has taken out as well. The umbrella policy in this case provided such excess coverage and the defense endorsement of the umbrella policy required Hartford to defend against claims within that excess coverage, i.e., claims not covered by the underlying policies but covered in the umbrella policy. Giffels-Webster's claims fall within the umbrella policy's excess coverage and Hartford should have defended them.
 
 IV.
 
 41
 Hartford finally contends that the district court erred by awarding Capitol the full amount paid in settlement of the claim, along with fees incurred in the settlement, without deducting the $25,000 retained limit of liability provided for in the policy. Under Michigan law, when an insurer fails to fulfill its duty to defend an insured, it becomes liable for the full extent of the judgment against the insured. "If the insurer had an obligation to defend and failed to fulfill that obligation, then, like any other party who fails to perform its contractual obligation, it becomes liable for all foreseeable damages flowing from the breach.... An insurer's duty to defend is independent of its duty to pay, and damages for breach of that duty are not limited to the face amount of the policy." Stockdale v. Jamison, 416 Mich. 217, 330 N.W.2d 389, 392 (1982). One basis for this rule seems to lie in the law's reluctance to allow the insurer to benefit from the uncertainty created when it renounces its duty. Thus, an insured is not "required to prove that the amount of the judgment in excess of the policy limits was caused by the failure of the insurer to provide a reasonable defense, since if the insurer had provided a reasonable defense as required by its contract, there would be no need for anyone to attempt to offer proofs on that illusive subject." Maynard v. Sauseda, 121 Mich.App. 644, 329 N.W.2d 774, 779 (1982).[4] This general rule applies as well to settlements. Detroit Edison v. Michigan Mut. Ins. Co., 102 Mich.App. 136, 144, 301 N.W.2d 832 (1980). The district court, then, correctly ruled that Capitol's right to indemnification is not limited by the $25,000 retained limit of liability specified in the policy.
 
 V.
 
 42
 The thrust of Hartford's claim that its policy of insurance is not applicable is that its liability under the policy is limited to losses which arise from occurrences of property damage, as those terms are defined in the umbrella policy. While this is undoubtedly a correct interpretation as far as it goes, we believe, construing any ambiguities in policy terms against the insurer as we must, Raska v. Farm Bureau Mut. Ins. Co., 412 Mich. 355, 314 N.W.2d 440 (1982), that the liability alleged by Giffels-Webster falls within the coverage of the umbrella policy. It is at the outset most apparent that the limitations of exclusion (k) of the comprehensive general liability policy, which do not appear in the umbrella policy, do not themselves specifically act as any inclusion under the umbrella policy. We cannot but note, though, that had Hartford wished such an exclusion, it knew how to frame it and could easily have done so. We therefore conclude that Hartford may not find protection from loss which might otherwise have been excluded under exclusion (k), merely because the loss was "due to a mistake or deficiency in any design, formula, plan, specification, advertising material, or printed instructions prepared or developed by any insured...." While these issues are not free from doubt, we are fully satisfied, as was the Michigan judge, that under Michigan law the loss incurred here is one which was insured by Hartford's umbrella policy. Presumably had a loss occurred which was under exclusion (k), but which was otherwise compensable under the umbrella policy, Hartford would have been obligated to have defended Capitol Reproductions, or having defended it unsuccessfully, would have been liable to pay only those damages which exceeded the $25,000 retained limits set forth in the umbrella policy. Since Hartford elected not to defend, we will not endeavor to determine what its liability would have been had it defended Capitol, but instead we conclude that the district court correctly held Hartford liable for all the foreseeable damages flowing from its breach.
 
 
 43
 AFFIRMED.
 
 
 
 *
 Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation
 
 
 [1]
 The umbrella policy provided:
 
 
 [1]
 Coverage: The company will indemnify the insured for all sums which the insured shall become legally obligated to pay as damages and expenses, all as hereinafter defined as included within the terms ultimate net loss, by reason of liability (a) imposed upon the insured by law ... because of ... (ii) property damage caused by ... an occurrence which takes place during the policy period anywhere in the world
 The policy defined "occurrence" as:
 "Occurrence" means an accident which takes place during the policy period, or that portion within the policy period of a continuous or repeated exposure to conditions, which causes personal injury, property damage or advertising liability neither expected nor intended by the insured.
 The policy further defined "property damage" as:
 "Property Damage" means injury to or destruction of tangible property, other than property owned by a named insured, and all loss resulting therefrom.
 
 
 [2]
 In order to find that a diminution in value constitutes property damage some courts have required direct evidence that the defective component caused a decrease in the end product's value and that this decrease was not solely attributable to the decrease in the value of the defective component. See Pittway Corp. v. American Motorists Ins. Co., 56 Ill.App.3d 338, 13 Ill.Dec. 244, 370 N.E.2d 1271 (1977); Sturges Mfg. Co. v. Utica Mut. Ins. Co., 37 N.Y.2d 69, 371 N.Y.S.2d 444, 332 N.E.2d 319 (1975); Yakima Cement Products Co. v. Great Am. Ins. Co., 93 Wash.2d 210, 608 P.2d 254 (1980); but see Dakota Block Co. v. Western Cas. & Sur. Co., 81 S.D. 213, 132 N.W.2d 826 (1965). In present case, the plaintiff alleged that the damages were the result of remedial measures necessary to compensate for the improper placement of the sewage lines. It did not allege that the sewer pipes themselves were somehow diminished in value
 
 
 [3]
 Without discussing market value, other state courts have found property damage where a defective component has been incorporated into a product. Generally in these cases the defective element, once incorporated, could not be readily separated from the end product. See, e.g., Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 461 N.E.2d 209 (1984); Havenstein v. Saint Paul-Mercury Indem. Co., 242 Minn. 354, 65 N.W.2d 122 (1954); United States F. & G. Co. v. Nevada Cement Co., 93 Nev. 179, 561 P.2d 1335 (1977); Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co., 34 N.Y.2d 356, 357 N.Y.S.2d 705, 314 N.E.2d 37 (1974); Dakota Block Co. v. Western Cas. & Sur. Co., 81 S.D. 213, 132 N.W.2d 826 (1965); Gulf Ins. Co. v. Parker Prod., 498 S.W.2d 676 (Tex.1973). Property damage resulted in these cases either because the defective element itself rendered the end product unfit for its intended purpose, id., or because the measure required to remove the defective element were costly and/or diminished the end product's ultimate usefulness. See Elco Ind. Inc. v. Liberty Mut. Ins. Co., 90 Ill.App.3d 1106, 414 N.E.2d 41, 46 Ill.Dec. 319 (1980); Wyoming Sawmills, Inc. v. Transportation Ins. Co., 282 Or. 401, 578 P.2d 1253 (1978) (en banc). Under this reasoning as well, the land would have suffered injury since the measures necessary to compensate for the shallow pipes were both expensive and themselves destructive
 
 
 [4]
 Vacated on other grounds, 417 Mich. 1100.20, 338 N.W.2d 189 (1983), rehearing on remand, 130 Mich.App. 445, 343 N.W.2d 590 (1983), app. den., 417 Mich. 1100.20, 361 N.W.2d 342 (1983)