*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0168p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

STRYKER CORPORATION and HOWMEDICA
OSTEONICS CORPORATION,
      *Plaintiffs-Appellees/Cross-Appellants,*

STRYKER SALES CORPORATION,
                    *Plaintiff,*

    *v.*

XL INSURANCE AMERICA, fka Winterthur
International America Insurance Company,
      *Defendant-Appellant/Cross-Appellee,*

NATIONAL UNION FIRE INSURANCE CO. OF
PITTSBURGH, PENNSYLVANIA,
                 *Defendant*.

Nos. 09-2332; 10-2383

Appeal from the United States District Court for the
Western District of Michigan at Kalamazoo.
No. 4:01-cv-157—Robert Holmes Bell, District Judge.

Argued: April 10, 2012

Decided and Filed: June 5, 2012

Before: GUY, COLE, and ROGERS, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Jonathan D. Hacker, O'MELVENY & MYERS LLP, Washington, D.C., for
Appellant. David J. Gass, MILLER JOHNSON, Grand Rapids, Michigan, for Appellees.
**ON BRIEF:** Jonathan D. Hacker, O'MELVENY & MYERS LLP, Washington, D.C.,
Michael W. Betz, David J. Bloss, BLOSS BETZ, Grand Rapids, Michigan, for
Appellant. David J. Gass, D. Andrew Portinga, J. Michael Smith, MILLER JOHNSON,
Grand Rapids, Michigan, for Appellees. Michael F. Smith, THE SMITH APPELLATE
LAW FIRM, Washington, D.C., for Amicus Curiae.

1

———————————

**OPINION**

———————————

COLE, Circuit Judge.   Stryker Corporation ("Stryker"), a manufacturer of medical devices, brought an insurance coverage action against its umbrella insurer XL Insurance America, Inc. ("XL"), seeking coverage for claims stemming from the implantation of expired artificial knees.  The district court held that XL was liable under the policy for the entirety of Stryker's losses on both direct claims brought against Stryker, as well as claims brought against Pfizer that Stryker was obligated to reimburse. On appeal, XL challenges the district court's ruling that the XL policy covers the claims at issue, the ruling that XL was liable for the full amount of Stryker's losses, and the ruling that the entire amount owed to Stryker was subject to pre-judgment interest. Stryker also cross-appeals the award of interest, arguing that it should run through the entry of the amended judgment, as opposed to terminating upon the entry of the first final judgment.  For the reasons set out below, we AFFIRM the district court's judgment with regard to XL's liability for Stryker's claims and the interest calculations, REVERSE the district court's judgment with regard to all remaining issues, and REMAND to the district court for further proceedings consistent with this opinion.

I. BACKGROUND

*A.  The Claims*

In 1997 and 1998, Howmedica, Inc., an Irish company which was a wholly-owned subsidiary of Pfizer, Inc. ("Pfizer"), manufactured and distributed an artificial knee joint known as Duracon Unicompartmental Knees ("Uni-Knees").  *Stryker Corp. v. XL Ins. America, Inc.*, No. 4:01-cv-157, 2007 WL 1031641, at *1 (W.D. Mich. April 3, 2007) ("*Stryker I* Coverage Opinion").  Key components of the Uni-Knees were made of ultra-high-molecular-weight-polyethylene ("UHMWPE").  *Id.*  In the mid-1990s, it was discovered that the standard procedure to sterilize medical devices after manufacture—gamma irradiation—caused UHMWPE to degrade slowly when exposed

to the air contained in the device packaging, potentially leading to device failure. *Id.* Howmedica and Pfizer determined that, because of this potential problem, Uni-Knees should have an expiration date of five years after manufacture. *Id.* To ensure that expired products did not ship to customers, Pfizer developed a computerized database program to monitor all of their products containing UHMWPE. *Id.* However, as became clear later, Uni-Knees were accidentally not entered into the database.

At the end of 1998, Stryker acquired Howmedica from Pfizer pursuant to a stock and asset purchase agreement ("the Agreement"). *Id.* Under the terms of the Agreement, Stryker was to indemnify Pfizer for any costs associated with claims brought against Pfizer relating to Howmedica products, such as Uni-Knees.

In late 1999, a Stryker sales representative prepared an incident report disclosing that an expired Uni-Knee had been implanted in a patient. *Id.* at *11. After an investigation, Stryker believed that the error was "at the hospital end," i.e., that hospitals had been using inventory that had been sitting on their shelves past the five-year expiration date. *Id.* On December 30, 1999, Elizabeth Staub, Stryker's Vice President for Quality Assurance, Regulatory Affairs, and Clinical Research, distributed a memorandum to Stryker sales personnel, reminding them of the five-year expiration date and instructing them to reinforce the rule with their customers ("the Staub Memo"). *Id.* at *11-12. By 2000, however, it became clear that the error was on Stryker's end—expired Uni-Knees were being kept in Stryker warehouses and from there sold to hospitals and implanted in patients. *Id.* at *13. This fact was memorialized in a July 28, 2000, letter to Stryker personnel. Beginning in 2000, Stryker was the subject of lawsuits from patients who received expired Uni-Knees and had those devices fail after implantation. In total, seventy-seven suits were brought against Stryker, and many of those cases also contained claims against Pfizer.

*B. The XL Insurance Policy*

For the policy year 2000, Stryker purchased a Commercial General Liability umbrella policy from Winterthur International America Insurance Company, now known as XL. The policy provided for $15 million in coverage for each occurrence, and $15

million in aggregate coverage, over a $2 million self-insured retention ("SIL"). The policy ("the XL policy") imposes a duty on the part of the insurer to defend suits that would be covered under the policy, and that any defense costs would be in addition to the policy limits. The XL policy also required indemnification for "[a]ny [] organization . . . to whom [Stryker is] obligated by a written insured Contract to provide insurance such as is afforded by this policy but only with respect to [] liability arising out of operations conducted by [Stryker] or on [Stryker's] behalf." Finally, the XL policy contained an endorsement related to medical devices ("the Medical Product Endorsement"), which grouped all medical products with the "same known or suspected defect or deficiency which is identified by the same advisory memorandum" into one "batch" or occurrence for coverage purposes. The endorsement provided that the advisory memorandum set the date at which the batch "occurred" for coverage purposes. However, the endorsement provided that "[b]atch coverage shall not apply to any loss which arises out of a defect or deficiency that is known or suspected prior to 1-1-[20]00."

Stryker tendered notice of claims to XL in August 2000, seeking defense and indemnification under the XL policy. On October 11, 2001, XL notified Stryker that it was denying coverage under the XL policy, arguing that the claims arise out of a "defect . . . that [was] known or suspected prior to 1-1-[20]00," and thus not covered pursuant to the Medical Product Endorsement.

Stryker filed suit against XL in the Western District of Michigan on October 4, 2001, seeking defense and indemnification for claims against Stryker related to expired Uni-Knees under the XL policy ("*Stryker I*"). Soon after, Pfizer brought suit against Stryker in the Southern District of New York, alleging that Stryker was obligated to indemnify Pfizer against claims brought against Pfizer related to the Uni-Knees. That court eventually granted summary judgment in favor of Pfizer, holding that Stryker was required to indemnify Pfizer under the Agreement. *See Pfizer Inc., v. Stryker Corp.,* 348 F. Supp. 2d 131, 159 (S.D.N.Y. 2004). Stryker tendered the judgment in the Pfizer case, $17.7 million plus interest, to XL for indemnification. XL denied that claim as well, and

so Stryker filed a second action against XL, as well as against the excess insurer, TIG. *Stryker Corp. et al. v. XL Insurance America, Inc. et al.*, No. 1:05-cv-051-RHB ("*Stryker II*").

*C.  District Court Proceedings*

Over the course of the ten-year history of this case, the district court issued six rulings that are relevant on appeal.  On April 3, 2007, the district court issued the *Stryker I* Coverage Opinion, stemming from a five day bench trial.  In that opinion, the district court held that the XL policy does cover direct claims against Stryker.  In a separate order in *Stryker II*, the district court held that XL was liable for Stryker's obligations to Pfizer under the Agreement

On December 15, 2008, the district court ruled on Stryker's motion for summary judgment, holding that Stryker's settlements with the underlying plaintiffs, as well as most of Stryker's proffered defense costs, were reasonable.  2008 WL 5235886 (W.D. Mich. Dec. 15, 2008) ("*Stryker I* Damages Opinion").  The opinion also established that Stryker was entitled to pre-judgment interest on these sums, without establishing the amount of that interest.  On February 9, 2009, XL entered into a settlement with Pfizer, under which it would pay $26 million to settle all of Stryker's liability to Pfizer ("the Pfizer settlement").  XL thereafter filed a motion for  summary judgment, arguing that the Pfizer settlement exhausted the XL policy, and thus XL was no longer liable for the sums outlined in the *Stryker I* Damages Opinion.  On October 7, 2009, the district court denied the motion, holding that XL's breach of the duty to defend Stryker voided any limits of liability in the XL policy.  2009 WL 3256179 (W.D. Mich. Oct. 7, 2009) ("Final Judgment Opinion").  Accordingly, XL was responsible for all of Stryker's losses associated with Uni-Knees claims.  In addition, the district court entered a final judgment on the same day, directing the parties to file a motion to amend the judgment to add the final interest calculation.

XL appealed that final judgment.  XL also filed a cross-motion for relief from judgment, arguing that it was not subject to pre-judgment interest in light of a recent Michigan Court of Appeals case which, XL argued, changed the governing law.  The

district court denied XL's motion.  726 F. Supp. 2d 754 (W.D. Mich. 2010) ("First Interest Opinion").  XL appealed that determination as well.  Subsequently, Stryker filed another motion to amend the judgment, arguing that pre-judgment interest should be recalculated based on the date of the First Interest Opinion, rather than the Final Judgment Opinion.  The district court denied this motion.  2010 WL 3937180 (W.D. Mich. Oct. 4, 2010) ("Second Interest Opinion").  Stryker appealed this determination, and the appeals were consolidated for purposes of review.

## II.  ANALYSIS

*A.  General Insurance Principles*

Michigan law, which governs the substantive issues in the case, treats insurance contracts in the same manner as other contracts.  *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005).  Therefore, a court should "give contractual language that is clear and unambiguous full effect according to its plain meaning unless it violates the law or is in contravention of public policy."  *Westfield Ins. Co. v. Ken's Service*, No. 300941, 2012 WL 752038 (Mich. Ct. App. Mar. 8, 2012).  "Under Michigan law, exclusion clauses and ambiguous provisions in insurance policies are strictly construed against the insurer."  *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 455 (6th Cir. 2003).

*B.  Coverage under the XL Policy*

In the *Stryker I* bench trial, the district court found that the XL policy provides coverage for claims made against Stryker in connection with Uni-Knees failures. Factual findings made at a bench trial are reviewed for clear error, which occurs "if, based on the entire record, we are left with the definite and firm conviction that a mistake has been committed."  *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011) (quoting *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 364-65 (6th Cir. 2009)).  Legal conclusions that stem from factual findings are reviewed de novo.  *Id.*  Under Michigan law, the proper interpretation of an

insurance policy provision is a legal question, and thus reviewed de novo. *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 463 (Mich. 2003).

Whether the XL policy provides coverage turns on the interpretation of the Medical Products Endorsement. The Medical Products Endorsement alters the definition of "occurrence" under the policy, such that all claims arising out of a single "known or suspected defect" are considered to be one occurrence for coverage purposes. Such "batch coverage," however, does not apply to "any loss, which arises out of a defect, or deficiency that is known or suspected prior to 1-1-[20]00." Thus, if the "defect" occurs before January 1, 2000, then there is no batch coverage for the underlying claims.[1]

Thus, the heart of the dispute between the parties is the precise "defect" that triggers the batch coverage under the Medical Products Endorsement. The district court found that "Duracon Uni-Knees were defective if they were available in inventory for implantation by physicians beyond their shelf-life, that is beyond five years." *Stryker I* Coverage Opinion, 2007 WL 1031641, at *10. While the phrase "in inventory" is potentially ambiguous, the district court went on to make clear that "in inventory" means "in Stryker's inventory." "In deciding to send the Staub Memo, Ms. Staub never thought that instances of expired polyethylene that prompted Mr. Irwin's suggestion *could have been the result of [Stryker] shipping expired polyethylene*." *Id.* at *12 (emphasis added). The district court found that it was not until April 2000 that Stryker began to suspect that the problem stemmed from its own operations. Therefore, in the district court's view, "prior to January 1, 2000, no employee of Stryker . . . knew or suspected that Uni-Knees were available in inventory for implantation by physicians beyond their shelf life." *Id.* at *15.

XL does not challenge the factual findings of the district court regarding what facts Stryker personnel knew and when they knew them. Instead, XL argues in essence

---

[1]Strictly speaking, the Medical Products Endorsement speaks only to whether batch coverage applies to the claims against Stryker, not whether there is coverage generally under the policy. However, the policy limits coverage to "Bodily Injury . . . [or] Personal Injury . . . that takes place during the policy period . . . ." The policy also contains an exclusion for "Bodily Injury . . . expected or intended from the standpoint of the insured." If batch coverage does not apply under XL's theory, one or both of those provisions would work to deny coverage to the Stryker claims *in toto*.

that "in inventory" should be read as "in *anyone's* inventory."[2]  XL argues that it is undisputed that Stryker knew before 2000 (via the Staub Memo) that expired Uni-Knees were being used by physicians, and that fact is enough to defeat coverage.

The district court's construction of the Medical Products Endorsement is the more reasonable interpretation.  Under XL's theory, if an insured knows that there is some future scenario under which a product would become defective via expiration, even if it is completely out of the insured's hands, then there is no coverage.  While XL focuses on the Staub Memo, under XL's theory the Uni-Knees were barred from coverage from day one.  Stryker was aware since the mid-1990s that Uni-Knees would deteriorate after five years of shelf life.  Stryker also had to know that it was possible that some end-user would implant Uni-Knees after five years, despite the warnings Stryker provided.  That would be enough to defeat coverage under XL's interpretation. It would also mean that any medical product with an expiration date, such as most pharmaceuticals, would be uninsurable under the Medical Products Endorsement, since there is always the chance that the expiration date would not be heeded.

In addition, insurance contracts should be read "as a whole, giving harmonious effect, if possible, to each word and phrase."  *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 781 n.11 (Mich. 2003).  The district court determined that the "advisory memorandum" which locks in the occurrence for batch coverage purposes was the July 28, 2000, memo by Stryker.  XL does not challenge this determination on appeal.  A "batch" is defined as "all medical products which have the same known or suspected defect or deficiency which is identified by the same advisory memorandum."  Thus, in the first sentence of paragraph 3 of the Medical Products Endorsement, XL does not dispute that the "known or suspected defect or deficiency" dates to July 28, 2000.  Yet, XL argues that a few sentences later in the same paragraph "defect, or deficiency that is known or expected" should be interpreted to refer to a different, earlier, date.  This is

---

[2]Stryker filed a motion to strike this portion of XL's brief, arguing that it is inconsistent with XL's prior theory in the case.  Because we reject XL's argument on the merits, as discussed below, we do not address Stryker's argument and dismiss their motion as moot.

illogical and inconsistent with the requirement to provide a "harmonious effect, if possible, to each word and phrase."

Finally, any question of the interpretation of the policy must cut in favor of Stryker. As discussed above, XL's proposed interpretation of the policy would completely exempt Uni-Knees, and indeed any Stryker products containing UHMWPE, from coverage. It is highly unlikely that Stryker would have agreed to purchase such an insurance policy. It is true that Michigan has rejected the rule, applicable in other states, that insurance contracts should be interpreted to give effect to the reasonable expectations of the insured. *See generally Wilkie*, 664 N.W.2d at 782-86. However, the Michigan Supreme Court has equally emphasized that any ambiguities in an insurance policy must be construed in favor of coverage and against the insurer. *Id.* at 786-87. Thus, to the extent there is any ambiguity as to the meaning of the Medical Products Endorsement, it must be construed in favor of coverage. At most, XL's argument creates an ambiguity in the meaning of the policy language, which would in turn support coverage under the policy.

Therefore, we affirm the district court's judgment that the XL policy provides coverage for the claims made against Stryker in connection with Uni-Knees.

## C. Exhaustion of the XL Policy

### 1. Priority of Claims under the XL Policy

Because we hold that the XL policy covers claims relating to Uni-Knees, we must consider to what extent those claims exhaust the limits of liability under the policy. As a preliminary matter, Stryker argues that XL may not apply the Pfizer settlement in the *Stryker II* case to the XL policy prior to addressing the direct claims against Stryker at issue in *Stryker I*. Stryker's argument has both a procedural and substantive component. On the procedural front, Stryker argues that XL's motion for summary judgment was rejected by the district court as untimely and improper. Substantively, Stryker argues that the district court rejected XL's exhaustion argument because it violated the "district court's roadmap" for the case and is inconsistent with the district

court's entry of judgment in *Stryker I*. In addition, Stryker argues that XL's decision to pay the Pfizer claim first was a contrivance designed to limit XL's exposure to pre-judgment interest.

Stryker's argument is flawed for several reasons. First, it does not appear that the district court actually held what Stryker says it did. The district court did conclude that summary judgment was not the appropriate vehicle for XL's contentions. The district court then noted that the motion could be considered a motion for relief from judgment or reconsideration. Far from rejecting this construction, the district court concludes that "there does not appear to be a *procedural* reason why the court could not do so." Final Judgment Opinion, 2009 WL 3256179 at *2 (emphasis in original). The district court then proceeded to reject XL's argument on the merits. Stryker is simply incorrect that XL's motion was rejected on procedural grounds. Moreover, in reaching the merits, the district court did not mention a "roadmap," nor discuss a categorical rule regarding the order that XL must pay its claims. The only two grounds addressed by the district court relate to the exhaustion (or lack thereof) of the XL policy, as discussed in Parts II.C.2 and II.C.3, below.

In addition, even if the district court had ruled as Stryker suggests, such a ruling would be inconsistent with the language of the XL policy. In the limits of liability section of the policy, the "General Aggregate Limit" is defined as "the most we will pay for all damages covered under the Insuring Agreement . . . ." Similarly, in the defense obligation section of the XL policy, the duty to defend terminates when the "applicable Limits of Liability have been exhausted by payment of judgments or settlements." In both cases, exhaustion turns on the actual payment of money on behalf of the insured, not when a judgment that would obligate the payment of money is entered. Therefore, the question of whether the judgment in *Stryker I* was fully entered prior to the Pfizer settlement is irrelevant. Instead, the relevant question is at what point XL actually made provision to pay a claim on behalf of Stryker. As it is clear that XL entered into the

Pfizer settlement before it paid any claims under *Stryker I*, the Pfizer settlement can be used to exhaust the XL policy before considering the *Stryker I* judgment.[3]

### 2. Consequential Damages

XL's liability to Stryker under the policy is limited to the aggregate limit of liability on occurrences under the XL policy, which is $15 million above the self-insured retention of $2 million.  In Michigan, insurance policies are interpreted in the same manner as every other contract.  *Wilkie*, 664 N.W.2d at 780.  Indeed, the Michigan Supreme Court has explicitly rejected the approach, taken in other jurisdictions, that would apply special rules of interpretation to insurance policies distinct from those used for other commercial contracts.  *See id.* at 782 (rejecting the practice of "judges divin[ing] the parties reasonable expectations" as inconsistent with the "bedrock principle[s] of American contract law").  Therefore, the standard contract rule that any damages beyond the value of the contract must be proven to "arise naturally from the breach or those that were in contemplation of the parties at the time the contract was made," *Lawrence v. Will Darrah & Assoc., Inc.*, 516 N.W.2d 43, 45 (Mich. 1994) (quoting *Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 53 (Mich. 1980)), applies to insurance policies.  Thus, when an insurer breaches the duty to defend or indemnify under the policy, the insurer is responsible for "'expectation interest' through awarding damages for the *economic loss* suffered by the promisee." *Frankenmuth Mut. Ins. Co. v. Keeley*, 447 N.W.2d 691, 705 (Mich. 1989) (Levin, J., dissenting) (emphasis in original), *dissent adopted on rehearing*, 461 N.W.2d 666 (Mich. 1990).

The district court found that the self-insured retention and the aggregate limits of liability do not apply to the XL policy, because XL breached its duty to defend Stryker against both the direct claims and the claims in the Pfizer litigation.  Final Judgment Opinion, 2009 WL 3256179 at *4.  In reaching both conclusions, the district

---

[3]In addition, Stryker cites no Michigan case law stating that an insurer has an obligation to pay claims in a particular order.  Case law in other jurisdictions, however, makes clear that the general rule is that an insurer may pay claims in any order it chooses. *See In re September 11 Prop. Damage Litig.,* 650 F.3d 145, 153 (2d Cir. 2011) (New York law); *Elliott Co. v. Liberty Mut. Ins. Co.*, 434 F. Supp. 2d 483, 499 (N.D. Ohio 2006) (Ohio, Pennsylvania, Connecticut, New York, and Delaware law).

court relied on *Capitol Reproduction, Inc. v. Hartford Insurance Co.*, 800 F.2d 617, 624 (6th Cir. 1986), which held that "an insured is not required to prove that the amount of the judgment in excess of the policy limits was caused by the failure of the insurer to provide a reasonable defense . . . ." (internal quotation marks and citation omitted).  In other words, any losses resulting from a breach of the duty to defend could be assumed to be consequential losses, and thus would not account against any limits of liability.

While the *Capitol Reproduction* court may have correctly applied Michigan law at the time of the decision, subsequent Michigan decisions have undermined the rationale and holding of the case.  *Capitol Reproduction* holds that, in an insurance context only, all losses are assumed to be consequential losses, without the breached party's having to demonstrate the connection between the loss and the breach.  This is an extra-contractual rule of the kind the Michigan Supreme Court rejected in *Frankenmuth* and *Wilkie*.  As a federal court sitting in diversity, we are obligated to apply the law of Michigan as it currently stands, even if such an application is inconsistent with prior case law from this circuit.  *See Hampton v. United States*, 191 F.3d 695, 701 (6th Cir. 1999) ("[A] panel may reconsider [the panel opinion] because the Michigan courts have expressly indicated . . . that they disagree with [the panel opinion] and would have decided it differently."); *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1025-26 (6th Cir. 1995) (vacating a prior panel decision in light of a controlling state-law ruling from the Michigan Supreme Court).

For these reasons, we reverse the district court's judgment that the aggregate limit of liability of the XL policy does not apply to the judgments in *Stryker I* and *II*.  On remand, the district court should consider what portion, if any, of the total liability for *Stryker I* and *II* judgments beyond $15 million represents consequential damages as defined under Michigan contract law.

### 3. Application of the Pfizer Settlement to the XL Policy Limits

As an alternate holding, the district court determined that only the actual settlement payments to Pfizer, not Pfizer's defense costs or attorney's fees in connection with the litigation against Stryker, should count against the limits of the XL policy.

Final Judgment Opinion, 2009 WL 3256179 at *3. In reaching this conclusion, the district court considered Pfizer's defense costs in the tort suits together with Pfizer's defense costs in the litigation against Stryker. However, a close reading of the XL policy shows that the two sources of liability for XL are conceptually distinct.

XL's obligation to pay Pfizer's defense costs comes from the "Insured Contract" provision of the XL policy. The definition of an "Insured" under the XL policy includes "[a]ny person, organization, trustee or estate to whom you are obligated by a written Insured Contract to provide insurance such as is afforded by this policy . . . ." "Insured Contract," in turn, is defined as "any oral or written contract entered into by you and pertaining to your business under which you assume the tort liability of another party . . . ." In the separate section of the policy relating to defense obligations, the XL policy commits XL to defending "any suit against the Insured seeking damages on account of Bodily Injury, Property Damage, Personal Injury, or Advertising Injury." Defense costs are outside of the aggregate limits of liability: "All expenses we incur in the defense of any suit or claim are in addition to our Limits of Insurance."

Thus, with regard to costs stemming from tort suits against Pfizer, the district court was correct. The policy defines an "Insured" to include a party to an Insured Contract, in this case Pfizer. Thus, when Uni-Knees patients brought suits for bodily or personal injury against Pfizer, the defense provisions of the XL policy were triggered, and XL had a duty to defend Pfizer. This duty to defend is in addition to policy limits, so the district court is correct that those costs should not count against those limits.

XL cites a series of cases which state that a third-party to an Insured Contract is not entitled to a defense from the insurer. Those cases, however, deal with policies that do not define the "Insured" to include the third-party Insured Contract beneficiary. *See Raytheon Eng'rs & Constructors, Inc. v. Erie Interstate Contractors,* No. 200704705, 2008 WL 2345371, at *4 (Mass. May 14, 2008) ("The question remains, however, whether TIG owes any duty to a party *that is not a named or additional insured under the policy.*") (emphasis added); *Alliance Syndicate, Inc. v. Parsec, Inc.*, 741 N.E.2d 1039, 1045 (Ill. Ct. App. 2000) (holding that defense obligations do not accrue "[w]here

[the third party] was not an additional insured under the Alliance policy. . . ."); *Alex Robertson Co. v. Imperial Cas. & Indem. Co.*, 8 Cal. App. 4th 338, 343 (Cal. Ct. App. 1992) ("[The policy] also provides, '[t]he unqualified word 'Insured' wherever used (including endorsements forming a part hereof), shall mean the Named Insured'") (first alteration in original). Under the XL policy, the definition of "Insured" includes the party to the Insured Contract, making Pfizer an additional insured. Thus, those cases are distinguishable.

This same logic does not apply to the costs associated with the indemnification action. First, Pfizer filed suit against Stryker seeking indemnification under the Agreement, so the claim was not a "suit against the Insured" [i.e. Pfizer]. This places the action outside of the defense provisions of the XL policy. But even if Stryker had sued Pfizer, the defense provisions are limited to "suit[s] . . . seeking damages on account of Bodily Injury, Property Damage, Personal Injury, or Advertising Injury . . . ." The action between Pfizer and Stryker is none of those things—the parties agree that Stryker's obligation for Pfizer's costs associated with the indemnification dispute arise out of the terms of the Agreement. Instead, the costs associated with the action between Stryker and Pfizer stem directly from "liability . . . assumed by the Insured under an Insured Contract"—in this case the fee-shifting provisions of the Agreement. This liability is part of the general grant of coverage, and thus subject to the limits of liability.

Therefore, on remand, the district court should consider Pfizer's costs stemming from the indemnification action against Stryker as part of the sum that may be used to exhaust the $15 million aggregate limit of liability of the XL policy. By contrast, Pfizer's costs stemming from defending tort actions related to the Uni-Knees may not exhaust the XL policy, and XL is liable for those costs notwithstanding the limits of liability.

## D. Pre-Judgment Interest

The district court applied a pre-judgment interest penalty to XL with respect to the *Stryker I* judgment. In doing so, the district court ultimately held that, pursuant to Mich. Comp. Laws § 500.2006, 12% interest accrues on the indemnification portion of

*Stryker I* from the date Stryker settled the underlying tort law suits until entry of the first *Stryker I* judgment on October 9, 2009.  First Interest Opinion, 726 F. Supp. 2d at 767. In addition, 12% pre-judgment interest applies to the defense cost portion of *Stryker I* from the date the underlying tort suits were submitted to XL until the October 9, 2009 judgment.  *Id.* at 768.  XL argues that pre-judgment interest should not apply at all because the matters were "reasonably in dispute," and in any event should not apply to consequential damages.  Stryker cross-appeals, arguing all pre-judgment interest should run until the second amended judgment, entered on July 22, 2010.  An award of pre-judgment interest is reviewed for abuse of discretion.  *Scotts Co. v. Cent. Garden & Pet Co.*, 403 F.3d 781, 788 (6th Cir. 2005).

### 1. Application of Michigan Compiled Laws § 500.2006

Section 500.2006(4) divides insurance claims "not paid on a timely basis" into two categories.  For cases where "the claimant is the insured or an individual or entity directly entitled to benefits under the insured's contract of insurance," the interest rate is 12% per annum.  However, for "third party tort claimant[s]," the interest rate is 12% per annum "if the liability of the insurer for the claim is not reasonably in dispute, the insurer has refused payment in bad faith and the bad faith was determined by a court of law."  Michigan case law has reinforced this distinction and emphasized that first party insurance claimants need not demonstrate that the claim was "not reasonably in dispute" in order to recover the 12% interest.  *Griswold Properties, LLC v. Lexington Ins. Co.*, 741 N.W.2d 549, 566 (Mich. Ct. App. 2007) (special panel).

Relying on *Griswold*, the district court initially held that the entirety of the *Stryker I* judgment was subject to the 12% pre-judgment interest because Stryker was an "insured," and thus entitled to pre-judgment interest from the tender of the claim to XL, regardless of whether the matter was in dispute.  The district court reconsidered this award in light of the intervening Michigan Court of Appeals decision in *Auto-Owners Insurance Co. v. Ferwerda Enterprises., Inc.* (*Ferwerda I*), 797 N.W.2d 168, 175 (Mich. Ct. App. 2010), where the Michigan Court of Appeals held that a breach of the insurance contract that was "specifically tied to the underlying third-party tort claim," was subject

to the "reasonable dispute" rule in § 500.2006(4). In analyzing *Ferwerda I*, the district court concluded that a claim is "tied" to the third-party tort claim up until the point where the insured pays the claim, at which point it is converted into a first-party claim. First Interest Opinion, 726 F. Supp. 2d at 767. Therefore, the district court modified the pre-judgment interest award with regard to the settlements, holding that the interest accrues from the date that Stryker settled the claim. *Id.* However, with regard to defense costs, the district court held that they were always "first party" claims, since they are a benefit due directly to Stryker. Therefore, pre-judgment interest on those claims began to run when Stryker tendered the claim to XL. *Id.* at 768.

XL argues that all pre-judgment interest in this case is subject to the "reasonable dispute" rule, per *Ferwerda I*, because the *Stryker I* judgment stems ultimately from third-party tort claims against Stryker. Stryker, by contrast, argues that the Michigan Supreme Court vacated *Ferwerda I* via its subsequent decision in *Ferwerda II*. 784 N.W.2d 44 (Mich. 2010) (*Ferwerda II*). Thus, Stryker argues that we should not consider *Ferwerda I* at all, and instead reinstate the district court's original pre-judgment interest calculation.

Stryker's argument goes too far, because the Michigan Supreme Court reversed *Ferwerda II* on other grounds, and at no point does the court say it is vacating the penalty interest analysis. At most, the Michigan Supreme Court's corrections turn the penalty interest analysis in *Ferwerda I* into dicta. In the absence of a clear pronouncement from the Michigan Supreme Court, a federal court sitting in diversity "must predict how the court would rule by looking to all the available data." *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). Even if *Ferwerda I* is in fact dicta, it was not improper for the district court to consider *Ferwerda I* to predict how Michigan courts would handle penalty interest. Nevertheless, the uncertain status of *Ferwerda I* does significantly undercut XL's argument that all claims stemming ultimately from third party tort actions are always subject to the "reasonable dispute" rule. This is particularly true because the plain language of the statute focuses on the identity of the claimant who is seeking benefits from the insurer,

not the underlying source of the claim. Here, it is undisputed that Stryker is the claimant, because Stryker already paid off the third-party tort claims. The district court's rule is therefore a logical one and one that is consistent with the statutory language—as long as the "claimant" is a third-party, the "reasonable dispute" rule applies; the moment the "claimant" becomes the insured, it ceases to apply.

XL also argues that any consequential damages for which it is liable, such as attorney's fees, should not be subject to penalty interest. The district court held that Stryker's attorney's fees were subject to the penalty interest statute, accruing on the date Stryker submitted the underlying tort claims to XL. First Interest Opinion, 726 F. Supp. 2d at 768. XL argues that this is in error, relying on a provision of § 500.2006(4) which states that, "[i]f the loss exceeds the limits of insurance coverage available, interest shall be payable based upon the limits of insurance coverage rather than the amount of the loss." XL reads "interest shall be payable based upon the limits of insurance coverage rather than the amount of the loss" to mean that the court can only apply penalty interest to the sum that was used to exhaust the policy limits, and not any other sums that would not be subject to the limits.

XL's reading of the statute is unnecessarily narrow. A panel of this court, interpreting § 500.2006(4), held that attorney's fees stemming from an insurer's breach of the duty to defend were subject to penalty interest. *Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pa.*, 345 F. App'x 995, 1001-02 (6th Cir. 2009). A reasonable reading of the statute is that the insurer is subject to pre-judgment interest on the amount it actually has to pay to the insured. Such payments in a real sense do not "exceed the limit of insurance coverage available." However, to the extent that there are amounts that the insurer is not liable to pay because they are beyond the limits of liability, those amounts are not subject to pre-judgment interest. On remand, the district court should follow the same methodology it used in calculating prejudgment interest. However, the district court should recalculate the pre-judgment award based on the total amount for which XL is actually liable to Stryker, including any defense costs and consequential damages.

### 2. *End-Date for Calculating Pre-Judgment Interest*

Stryker in its cross-appeal argues that the district court should have re-calculated the pre-judgment interest award from the date of the First Interest Opinion, as opposed to using the date of the Final Judgment Opinion as the end of the interest period.  The parties agree that pre-judgment interest should run up until the point where the federal post-judgment interest provisions are triggered.  Post-judgment interest is calculated "from the date of the entry of the judgment . . . ."  28 U.S.C. § 1961(a).  The court has interpreted "judgment," for purposes of the statute, to mean "any judgment that is not entirely set aside." *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 429 (6th Cir. 1999).  By that definition, the Final Judgment Opinion would be the judgment, as it contained findings relating to the amount of pre-judgment interest that the First Interest Opinion did not completely vacate.

This conclusion is potentially in tension with *Scotts*.  403 F.3d 781.  In *Scotts*, the first judgment was followed by two subsequent judgments that modified the total award, but did not set aside the conclusions of the first judgment.  The district court used the first judgment as the cut-off for pre-judgment interest, but the panel reversed and remanded to the district court to recalculate interest from the last judgment in the case. *Id.* at 792-93.  Stryker argues that the court's rationale in *Scotts*—that the prevailing party should be entitled to an extended period of pre-judgment interest—applies with equal force here.

*Scotts* is distinguishable.  In *Scotts*, the first mention of pre-judgment interest in the opinions of the district court was the final judgment, not any of the earlier judgments. *Id.* at 783, 786-88.  As the district court stated, the *Scotts* opinion "merely aligned the accrual of prejudgment interest with the date that prejudgment interest was first awarded."  Here, there is no question that pre-judgment interest was awarded by the district court in the First Interest Opinion.  This makes this case factually closer to *Skalka* than to *Scotts*.  Thus, we affirm the district court's judgment with regard to the date that pre-judgment interest terminates.

## III.  CONCLUSION

Accordingly, we AFFIRM the district court's judgment in part, REVERSE in part, and REMAND for further proceedings consistent with the opinion.  In addition, we DISMISS AS MOOT Stryker's motion to strike a portion of XL's Reply Brief.